David D. ADAMIEC, Plaintiff,

v.

GAS WORKERS UNION, LOCAL 18007 SERVICE EMPLOYEES' INTERNATIONAL UNION, AFL–CIO and The Peoples Gas Light & Coke Company, Defendants.

No. 97 C 1586.

United States District Court, N.D. Illinois, Eastern Division.

Aug. 6, 1998.

Susan Bogart, Law Office of Susan Bogart, Chicago, IL, for David D. Adamiec.

Barry Milton Bennett, Dowd, Bloch & Bennett, Chicago, IL, Stephen Jay Feinberg, Margaret Ann Angelucci, Asher, Gittler, Greenfield, Cohen & D'Alba, Chicago, IL, for Local 18007 Gas Workers Union, Service Employees' Intern. Union, AFL–CIO.

Stephen Jay Feinberg, Margaret Ann Angelucci, Asher, Gittler, Greenfield, Cohen & D'Alba, Chicago, IL, John P. Jacoby, Paula Kay DeAngelo, James Vincent Garvey, Vedder, Price, Kaufman & Kammholz, Chicago, IL, Michael V. Perry, Jennings, Strouss & Salmon, Phoenix, AZ, for Peoples Gas, Light and Coke Co.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

David Adamiec began working for defendant Peoples Gas Light and Coke Company ("Peoples Gas") in 1979 and stayed there for over seventeen years. He eventually rose in the ranks to Crew Leader of the North Shop storeroom in the company's Purchasing and Stores Department, the unit responsible for buying supplies used in company operations. On May 31, 1996, however, Adamiec's employment came abruptly to a halt. He was unceremoniously summoned to a conference room by Stores Manager Pat Fergus and, with little explanation, suspended without pay. At Adamiec's request, his Union Steward[1], John DeWitt, attended the meeting:

> Fergus: The purpose of this meeting is to discuss a serious issue which will result in disciplinary action.... We are currently conducting an investigation into irregularities with Storeroom records, missing material and information regarding the reported May 30th [North Shop] break in. You may not contact any of your fellow employees, except the steward, regarding this investigation or in any way hamper or interfere with this investigation. You are not allowed on any company premises unless requested by your supervisors. If you have any questions you should contact me directly. This is a direct order! Failure to follow this order will be considered insubordination.

> Effective immediately, you are placed on indefinite unpaid layoff subject to discharge pending completion of the investigation. We will contact you when we have finished the investigation and will inform you of any charges which may result. We may contact you as a part of the investigation. Do you have any questions?

> Adamiec: What are the charges against me?

> Fergus: We are currently conducting an investigation into irregularities with Storeroom records, missing material and information regarding the reported May 30th break in.

1. Adamiec was a member of defendant Gas Workers Union, Local 18007 Service Employees' International Union, AFL—CIO ("the Union"). The Union's membership is composed entirely of Peoples Gas employees, whom the Union serves as exclusive bargaining representative. In this capacity, the Union negotiated a Collective Bargaining Agreement with Peoples Gas and executed it on May 13, 1994. Relevant for our purposes are the CBA's grievance procedures, which we recount later in the opinion.

Adamiec: What specifically are the charges? You're not giving me any specifics!

Fergus: That's right. I'm giving you what I'm giving you.

DeWitt: Does it have to do with the files?

Fergus: It has to have something to do with the files.

DeWitt: What specific missing material?

Fergus: I can't tell you at this time.

. . .

Adamiec: How long is the layoff?

Fergus: Indefinite.

Adamiec: No specifics?

Fergus: Not at this time.

Adamiec: I don't understand.

Fergus: You'll have adequate time to respond.

Adamiec: Layoff, just like that?

Fergus: Yes, per the serious information I have.

Adamiec: What is the charge?

Fergus: You'll be told at a later time. No further questions.

Pl.'s Ex. E. Adamiec and DeWitt were thus left with only the vaguest of notions about the charges prompting Adamiec's indefinite layoff.

One month later, Adamiec was discharged. His alleged offenses were: (1) placing orders for supplies without authorization; (2) falsifying reports of a North Shop break in; (3) failure to maintain control over storeroom stock; and (4) insubordination for contacting an employee during his suspension. Adamiec filed a grievance under the procedures set forth in the Collective Bargaining Agreement ("CBA") between the Union and Peoples Gas, but the Union pursued his grievance only through the second step—two steps short of arbitration. Within six months after the Union Executive Board's final decision to drop the grievance, Adamiec filed suit in this Court, alleging that both the company and the Union violated section 301 of the Labor

Management Relations Act, 29 U.S.C. § 185 ("LMRA"). Adamiec claims that the Union breached its duty of fair representation under the Act by refusing to take his grievance past the second step. He alleges that Peoples Gas breached the CBA in violation of the Act by, *inter alia*, discharging Adamiec without either just cause or a fair investigation. Pl.'s Complt. ¶¶ 7–11.

Before the Court is the Union and Peoples Gas' joint motion for summary judgment. Defendants argue that Adamiec cannot demonstrate that the Union's handling of his grievance breached its duty of fair representation. Because proving this representational breach is one of two compulsory LMRA elements (the other being the company's breach of the CBA), defendants contend that summary judgment is in order. Although we question the treatment Adamiec received from management at Peoples Gas, we do not have doubts about the adequacy of the Union's representation. Under the facts presented here, no reasonable juror could find that the Union breached its duty of fair representation to Adamiec. As such, we grant the defendants' motion for summary judgment.[2]

## LEGAL STANDARDS

### I. Summary Judgment

Summary judgment is proper when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.*, 40 F.3d 146, 150 (7th Cir.1994). A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court must view all evidence in a light most favorable to the nonmoving party, and draw all reasonable inferences from the evidence in the nonmovant's favor. *Cincinnati Ins.*, 40 F.3d at 150.

---

**2.** In contrast to our usual practice of beginning the opinion with the relevant facts, then setting forth the legal standards, followed by the analysis, we offer in this opinion a more detailed summary of the case up front, followed by the legal standards, and then merge the relevant facts with the analysis. Given the detailed factual record before us, we believe that this alternative structure minimizes redundancy.

But if the evidence is merely colorable, or is not significantly probative, or just raises "some metaphysical doubt as to the material fact," summary judgment may be granted. *Liberty Lobby*, 477 U.S. at 261, 106 S.Ct. 2505; *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

In making its determination, the court's sole function is to determine whether sufficient evidence exists to support a verdict in the nonmovant's favor. Credibility determinations, weighing evidence, and drawing reasonable inferences are jury functions, not those of a judge deciding a motion for summary judgment. *Liberty Lobby*, 477 U.S. at 255, 106 S.Ct. 2505.

## II. LMRA Claims

Section 301 of the LMRA grants an employee the right to sue for violation of a collective bargaining agreement between the employee's union and employer. 29 U.S.C. § 185(a). If the agreement contains an employment dispute resolution mechanism (such as a grievance procedure) the employee must prove two propositions to prevail under section 301:(1) the union breached its duty of fair representation and (2) the employer violated the agreement. *Filippo v. Northern Indiana Pub. Serv. Corp.*, 141 F.3d 744, 748 (7th Cir.1998) (citing *DelCostello v. International Bhd. of Teamsters*, 462 U.S. 151, 163–64, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983); *Vaca v. Sipes*, 386 U.S. 171, 186, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967)). In these so-called "hybrid 301" cases, "the employee's claim against the union and his claim against the employer are interlocked: neither claim is viable if the other fails." *Crider v. Spectrulite Consortium, Inc.*, 130 F.3d 1238, 1241 (7th Cir.1997). The motion before us challenges only Adamiec's ability to establish the Union's representational breach; we focus our opinion accordingly.

A union breaches its duty of fair representation under section 301 if its actions are arbitrary, discriminatory, or pursued in bad faith. *Air Line Pilots Ass'n Int'l v. O'Neill*, 499 U.S. 65, 67, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991); *Vaca v. Sipes*, 386 U.S. 171, 190, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); *Filippo*, 141 F.3d at 748. Phrased in the alternative, this formulation presents three different ways in which the plaintiff can prove a representational breach; courts must separately examine the proof supporting each alternative. *Garcia v. Zenith Elecs. Corp.*, 58 F.3d 1171, 1176 (7th Cir.1995); *Griffin v. Air Line Pilots Ass'n Int'l*, 32 F.3d 1079, 1083 (7th Cir.1994); *cf. Filippo*, 141 F.3d at 749 ("[T]o defeat a motion for summary judgment, plaintiff must proffer evidence supporting at least one of these elements."). Judicial review of union representational activity is nonetheless "highly deferential." *McKelvin v. E.J. Brach Corp.*, 124 F.3d 864, 867 (7th Cir. 1997). This deference stems from the fact that "Congress did not intend courts to interfere with the decisions of the employee's chosen bargaining representative." *Id.* (internal quotations and citations omitted); *see also O'Neill*, 499 U.S. at 78, 111 S.Ct. 1127 ("Any substantive examination of a union's performance ... must be highly deferential, recognizing the wide latitude that negotiators need for the effective performance of their bargaining responsibilities.").

The arbitrariness test, for example, is "quite forgiving." *Garcia*, 58 F.3d at 1176. A union acts arbitrarily only if, in light of the factual and legal landscape at the time, its actions are "so far outside a wide range of reasonableness as to be irrational." *O'Neill*, 499 U.S. at 67, 111 S.Ct. 1127. In the grievance context, this translates into the following principle: "so long as a colorable argument could be made at the time of the union's decision to drop its support that the grievance is meritless (and the union did not then treat substantively similar grievances differently from the plaintiff's), the decision cannot be regarded as arbitrary." *Trnka v. Local Union No. 688*, 30 F.3d 60, 61 (7th Cir.1994). The union need only conduct a "minimal investigation" to assess the grievance's merit—although the thoroughness required depends on the particular case—and "only an egregious disregard for union members' rights constitutes a breach of the union's duty." *Filippo*, 141 F.3d at 749 (internal quotations and citations omitted). To survive summary judgment on the arbitrari-

ness factor, then, the plaintiff cannot simply show that his position on merits of the grievance is as viable as the union's, but must demonstrate that the union's position "could eventually be deemed not even colorable." *McKelvin*, 124 F.3d at 868 (internal quotations and citations omitted).

■ While the arbitrariness question demands an objective review of the union's actions, the bad faith and discrimination components of fair representation "require[ ] inquiry into the subjective motivation behind union action." *Id.; see Crider*, 130 F.3d at 1243 ("Whereas the arbitrariness analysis looks to the objective adequacy of the Union's conduct, the discrimination and bad faith analyses look to the subjective motivation of the Union officials."). A plaintiff may prove that the union's action on her grievance was discriminatory by presenting evidence that the union treated substantively similar grievances more favorably, *see id.* at 1244 (plaintiff fired for refusing to take drug test claimed that previous discharges for refusing drug test were pursued farther in the grievance process), and may demonstrate bad faith with evidence that the union dropped a grievance in retaliation for the employee's perceived anti-union activity, *see Filippo*, 141 F.3d at 750 (plaintiff claimed union's grievance decision was bad faith retaliation for her election run against the incumbent union president); *Trnka*, 30 F.3d at 63 (plaintiff claimed union abandoned grievance in retaliation for his previous criticism of union leadership and policies).

■ Adamiec contends that the Union breached its duty of fair representation under each of the three alternatives. He claims that the Union's conduct was arbitrary in two respects: (1) the CBA allegedly requires the Union to pursue through arbitration every grievance that is not resolved to the employee's satisfaction, but the Union dropped Adamiec's after the second step—despite his dissatisfaction with the outcome; and (2) the Union's investigation was inadequate because it failed to evaluate the company's evidence, declined to interview the employees who implicated Adamiec, and ignored evidence that the company's charges were incredible. Adamiec maintains that the Union acted discriminatorily as well, insisting that the Union pursued similar grievances at least through the third step, if not through arbitration. Finally, he maintains that there is evidence of bad faith, arguing that his recent receipt of workers' compensation benefits and participation on a committee to improve employee-management relations angered union officials sufficiently to spur retaliation. We now examine the relevant facts, in light of the above legal standards, to determine whether Adamiec has produced evidence that would permit a reasonable juror to find in his favor on these claims.[3]

---

3. The facts are derived from statements that the parties filed with this Court under the Northern District of Illinois' Local General Rule 12(M)–(N). Rule 12(M)(3) requires a party moving for summary judgment to file a "statement of material facts as to which the moving party contends there is no genuine issue." The movant's statement must contain "specific references to affidavits, parts of the record, and other supporting material relied upon to support the facts set forth." Rule 12(M)(3). Similarly, Rule 12(N)(3)(a) requires the non-moving party to file a concise response to the movant's statement including, in the case of any disagreement, specific references to supporting materials. Rule 12(N)(3)(b) authorizes the non-moving party to submit a statement of "additional facts that require the denial of summary judgment." Under 12(M), the moving party may then submit a reply to the non-moving party's additional facts. All properly supported material facts set forth in either party's statement of facts are deemed admitted unless properly controverted. *See* Local Rule 12(M) and 12(N)(3)(b); *see also Flaherty v.* *Gas Research Institute*, 31 F.3d 451, 453 (7th Cir.1994). The mere denial of a particular fact without specific references to the affidavits, parts of the record, and other supporting materials is insufficient. *Flaherty*, 31 F.3d at 453. Where a properly supported factual assertion is met with such a naked denial, the fact may be deemed admitted. *Id.*

Plaintiff's counsel failed to comply with Rule 12(N) in several respects. For example, she did not file a statement of additional facts under Rule 12(N)(3), but rather dispersed these facts throughout her response brief and presented them in an argumentative manner. In addition, most of her 12(N)(3)(a) responses to the defendants' 12(M) statements contain no references to supporting materials; indeed, many fail even to provide a substantive response, interposing evidentiary objections instead. Since we ruled in our July 26 Order that all but one of these objections lack merit, and plaintiff's counsel has never filed a Fed.R.Civ.P. 56(f) affidavit explaining why she could not "present by affidavit facts

## RELEVANT FACTS AND ANALYSIS

### I. Background Facts

#### A. Grievance Procedures

We begin with a look at the grievance procedure contained in the CBA that the Union and Peoples Gas executed in 1994:

ARTICLE IV—GRIEVANCES

\* \* \* \* \* \*

A grievance shall be processed from step to step promptly. The last decision given on any grievance in any of the first three steps shall be considered a satisfactory adjustment unless, within ten days after the decision has been given, the grievance is carried to the next step. . . .

The procedure for the settlement of a grievance shall be as follows:

Section 2. (Step 1). The grievance shall first be discussed by the employee and his/her steward, or other Union official, with the employee's immediate supervisor.

Section 3. (Step 2). If the grievance is not satisfactorily adjusted in Step 1, it shall be discussed by the Union steward and/or the Business Manager of the Union and the local Superintendent and, if not satisfactorily adjusted, the Department Head. The employee shall have the right to be present at any such discussions.

Section 4. (Step 3). If the grievance is not satisfactorily adjusted in Step 2, the Business Manager of the Union shall so notify the Company in writing, stating the facts in dispute. Upon receipt of such notice the Company shall make an investigation and shall call a meeting of representatives of the Company and representatives of the Union, to be held within ten days after the receipt of such notice, for the purpose of adjusting the grievance.

Section 5. (Step 4). If the grievance is not satisfactorily adjusted in Step 3, it shall be referred to arbitration upon request of either party. The arbitration procedure shall be as follows. . . .

Pl.'s Ex. A, at 7–9. Although these provisions delineate what happens at each step of the procedure, they do not explain how the Union decides whether to pursue or drop a grievance between steps.

Tony Gerzen, the Union's Business Manager since 1986, fills this gap with his testimony. As its Business Manager, Gerzen is the Union's principal operating officer and its only full-time employee.[4] He is responsible for investigating grievances and administering the CBA's grievance procedure. After a grievance passes Steps 1 and 2A[5], decisions on whether to pursue it further (and ultimately to arbitration) are made by the Union's Executive Board, composed of the Business Manager and seven other elected officers. During the Board's monthly meeting, the Business Manager presents a report about each pending grievance. The Board then discusses the grievance's merits and votes on whether to proceed to the next step. A majority vote determines the outcome, and a tie is equivalent to a decision to drop the grievance.

essential to justify [her] opposition," we would be well within our discretion to deem these facts admitted without examining counsel's evidentiary submissions. Nevertheless, this Court's strong preference is not to punish the plaintiff for his attorney's missteps; as such, we have scoured the appendices that plaintiff's counsel filed in opposition to the motion for summary judgment and independently determined the undisputed facts.

4. Before he took the Business Manager position, Gerzen worked for thirteen years in the Peoples Gas Purchasing and Stores Department. He held various positions, including storeroom Crew Leader. Gerzen Aff. ¶ 1.

5. Step 1 is often combined with a Step "2A" meeting, attended by the employee, the Union Steward, the employee's supervisor, and the Department Superintendent. If the Executive Board decides to take the grievance further, there is a Step "2B" meeting, attended by the employee, the Union Steward, the Union Business Manager, the employee's supervisor, and the Department Superintendent. This procedure is supported not only by Gerzen's testimony, but by Plaintiff's Exhibit II, which attaches numerous Grievance Reports (written reports of Executive Board votes and Union Stewards' written reports on grievance meetings) referencing Step 1/2A meetings, Step 2B meetings, and Step 3 meetings. Adamiec's grievance was dropped after a Step 2B meeting.

### B. The Purchasing and Stores Department

Some background on the Purchasing and Stores Department is also in order. The Department operates a warehouse and seven storerooms, including the North Shop. The storerooms' function is to order and receive supplies for other units, such as the weld shop, the carpenter shop, and the tool shop. The requesting department initiates an order[6] by filling out a "material request ticket" that lists the desired supplies, and delivers the ticket to the storeroom. The storeroom Crew Leader or Senior Stock Keeper then places the order by entering the information from the ticket into the company's computerized "PIPS" system. He or she signs onto the terminal using a confidential personal security code, which appears, along with the person's identity, on the resulting computer printout. The material request ticket and computer-generated "Shipment Master Form" are then placed in a "pending orders" file in the storeroom.

When the supplies arrive, a storeroom employee receives them and makes sure that the shipment squares with the packing slip. At some point, a storeroom employee—not necessarily the same person that physically received the supplies—enters the delivery information into the PIPS system. This person's identity is recorded as well, after the words "received by" on the computer printout. Finally, all the documents (material request ticket, Shipment Master Form, and packing slip) are put in a "completed file" in the storeroom office.

The North Shop storeroom occupies an 80 × 78 foot space and is divided into three areas: a foyer, an office, and a secured storage area. At the time Adamiec was North Shop storeroom Crew Leader, he worked the 7:30 a.m. to 4:00 p.m. day shift, accompanied by William Brown (Senior Stock keeper) and David Dunne (Stock keeper). Ron Quinones worked the night shift as the Night Storekeeper. As Crew Leader, Adamiec was responsible for supervising these storeroom employees and enforcing storeroom procedures. Adamiec's supervisor in the Purchasing and Stores Department was Tom Fegan, who in turn reported to Dwaine Flanagan, a General Supervisor in the Stores Department. The Stores Department Manager (apparently the top position in the departmental hierarchy) was Patrick Fergus.

### C. Adamiec Reports a North Shop Burglary on May 29th 1996

On May 29th 1996, Adamiec called Fegan around 7:30 a.m. to report that someone had broken into the North Shop. He explained that the blue plastic seal used to secure the storage area was broken and lying on the floor. Fegan told Adamiec to determine whether anything was missing and, if so, to complete a Security Incident Report. Along with William Brown, Adamiec searched the area and completed a Security Incident Report listing the following missing items: (1) an electric pencil sharpener; (2) Brown's radio; (3) a full tool box; (4) a label maker; (5) Adamiec's coffee maker; and (6) a UPS scale. After Adamiec filled out the report, Brown told him that several completed files for supply orders—numbers 17000 to 19499 and 24000 to 25000—were missing as well. Adamiec reported all of this to Fegan. Later that day, Adamiec completed and signed a police report listing the missing items, including the files. Pl.'s Ex. C, D, OO.

Two days later, Fergus suspended Adamiec indefinitely, explaining only that the company was investigating "irregularities" with storeroom records, missing material and the reported burglary. He said that Adamiec would have a chance to respond "later," after the investigation. Union Steward DeWitt requested that Adamiec be permitted to work during the investigation, or, at the very least, be reassigned. When Fergus refused, DeWitt asked why. Fergus replied that he was taking these steps because the allegations

---

**6.** The parties mention two different types of orders: a "convenience" order and a "blanket" order. These orders differ only in the dollar amount and types of items permitted to be purchased (and which one is used depends on the contractual relationship between the company and the supplier). The approval process is the same for both. *See* Plaintiff's Exhibit SS–2. Among the company's "convenience order" suppliers at the time of Adamiec's employment were Root Brothers Manufacturing & Supply Co. and Midwest Welding Supply.

against Adamiec were "serious." Adamiec turned in his keys and I.D. and was escorted off the property. Def.'s Ex. 3.

### D. The Grievance Process and the Union's Investigation

On June 28th, 1996, Adamiec attended a meeting at Fergus' direction. DeWitt, Fegan, and Flanagan were present as well. Fergus announced that Adamiec's employment was terminated, and that the company's investigation substantiated the following charges:

1) *Failure to control stock in the storeroom:* two dozen pairs of gloves were discovered laying on the storeroom office floor on May 23rd, 1996. On May 28th, the gloves were missing. Computer records revealed that Adamiec had ordered the gloves at the welding shop's request, but the welding shop denied placing the order.

2) *Placing unauthorized orders:*

 a) *Root Brothers Order # 17945:* Release # 534. Adamiec ordered three light reels for the carpenter shop on February 7, 1996, but the carpenter shop said it had requested and received only one.

 b) Release # 576. Adamiec ordered a Makita Drill for the carpenter shop on April 2, 1996. The carpenter shop denied ordering or receiving it.

 c) Release # 555. Adamiec ordered a Milwaukee Sawzall for the welding shop, but the welding shop denied ordering or receiving it.

 d) Release # 580. Adamiec ordered a Milwaukee Grinder for the welding shop on April 8, 1996. The welding shop confirmed that it had ordered the Grinder, but never received it because Adamiec said he had canceled the order.

 e) Release # 530. Adamiec ordered two socket sets for the Distribution Department on January 30, 1996. Distribution said it neither ordered nor received the socket sets.

 f) Release # 585. Adamiec ordered two more socket sets for Distribution on April 12, 1996, but Distribution denied ordering or receiving them.

 g) *Midwest Supplies (the vendor) Order # 24437:* Release # 6. Adamiec ordered several supplies for the welding shop on March 14th, 1996, which the shop denied ordering or receiving.

 h) Release # 8. Adamiec ordered welding hoses and tips for the welding shop on March 28th, 1996, but the welding shop denied ordering or receiving the materials. Fergus said that a welding hose was found in a storeroom locker for which only Adamiec had keys.

Pl.'s Ex. H. Fergus emphasized that, except for one light reel and the weld hose, all the items that Adamiec ordered were missing, as were the material tickets authorizing their purchase. Fergus did not, however, produce documentary evidence supporting these charges, nor did he identify the sources of his information. Adamiec insisted that he had placed all the orders with authorization and that the material tickets reflecting this should be in the completed files. Adamiec also pointed out that other storeroom employees had received the shipments.

Fergus continued his recitation of the charges:

5) *Insubordination:* Fergus claimed that Adamiec had contacted a co-worker during his suspension period, contrary to Fergus' direct order.

6) *Falsifying Company Security Documents, a Verbal Report, and a Report of Break In:* According to Fergus, the storeroom was under surveillance on May 29th. He said the blue seal securing the storage area was checked nearly every hour until 6:30 a.m. and found intact each time. A video recorder showed that Adamiec was the first to arrive at the storeroom at 7:00 a.m. on the 29th.

DeWitt asked whether the video showed Adamiec breaking the seal. Fergus replied it did not. DeWitt observed that all the company's charges were based on circumstantial evidence. Def.'s Ex. 3; Pl.'s Ex. H.

Following the meeting, DeWitt submitted a Grievance Report detailing Fergus' state-

ment of the charges and Adamiec's response. Pl.'s Ex. H. Based on the fact that Fergus, the Stores Department Head, had attended this meeting, the company and Union agreed that it satisfied Steps 1 and 2A of the grievance procedure.

On July 8th, 1996, Tony Gerzen requested copies of Adamiec's disciplinary reports, and "any and all information regarding the charges the Company has against him; also include any photos, videos, etc." Def.'s Ex. 5. The same day, he told Adamiec that he was in the process of asking for all the Company's evidence, but remarked, "to be quite honest it doesn't look good." Def.'s Ex. 3.

The company responded to Gerzen's request on July 11th, 1996. Among the materials it provided Gerzen was an undated "Memo Regarding North Shop Storeroom Burglary." The memo reported that an unidentified employee contacted Fegan on May 23, 1996, concerned about the propriety of some orders ostensibly placed on behalf of the weld shop, carpenter shop, and tool room. The employee identified specific order numbers (many of which corresponded to the unauthorized ordering charges against Adamiec) and, when Fegan visited the North Shop, he discovered that the paperwork for these orders was missing from the completed files. Fegan checked the storeroom computer for information about these orders. When he asked a carpenter shop employee about an order Adamiec had placed at the shop's request, the employee became upset and denied placing the order. The memo stated that Fergus had accompanied Fegan to the storeroom, and noticed a box of welding gloves laying on the storeroom floor in an unsecured area. Finally, the memo reported that "a concerned employee" called Fegan on May 28th, relating that Adamiec had revealed that he planned to stage a break in at the North Shop. The source said that completed files from the 17000 and 24000 series were missing from the storeroom.

The company's evidence also included a May 30th, 1996 report by Michael Fullman of the Baker Street Detective Agency. His report stated that Peoples Gas hired him to conduct surveillance on the North Shop storeroom from 11:00 p.m. to 7:00 a.m. on May 28th–29th based on an "anticipated fictitious burglary claim." Fullman was told that, in order to break in, the burglar would have to enter the storeroom through a locked entrance and break the seal on the cage door leading into the storeroom's secured area. After watching the second shift employees leave the North Shop facility at 11:45 p.m., Fullman parked about 50 feet from the storeroom entrance. He had a key, and checked the storeroom on an almost hourly basis until 6:30 a.m. Each time, he found the blue plastic seal intact. He did not see anyone enter the storeroom. At approximately 6:45 a.m., Fullman relocated to the employee parking lot. He observed that Adamiec was the first to arrive at the storeroom, at 7:05 a.m.

Along with Fullman's report, the company produced color photographs and a video taken during Fullman's May 28th–29th surveillance. The company also provided copies of Adamiec's Security Incident and Police Reports indicating that Adamiec found the blue seal broken and lying on the storeroom floor when he arrived at work on the 29th, and that files from the 17000–19499 and 24000–25000 series were missing.

The company also included reports of Flanagan's June 7, 1996 interviews with several union-member employees. Flanagan questioned North Shop welders Tom Keane and Greg Nowak, North Shop carpenters Ken Salgado and Bill Lambert, and North Shop tool keepers Tony Caracci and Jim Sieja. These employees explained that they always completed material request tickets for orders through the storeroom. They denied ordering or receiving most of the supplies that corresponded to Adamiec's allegedly unauthorized orders. Along with the interview reports, the company produced another undated memo reporting the results of a North Shop inspection conducted after the alleged burglary. The memo stated that Fergus, Fegan and Flanagan directed storeroom employees Brown, Dunne, and Quinones to open their lockers, which contained nothing out of the ordinary. The supervisors then tried each employee's keys on a locker marked "D/C" without success. Using a key that Adamiec had given him, Fergus opened the

D/C locker, and discovered, among other things, a welding hose.

Finally, the company provided Gerzen shipping documents for two of the several allegedly unauthorized orders. Absent from this file, however, was documentary evidence supporting the order or receipt of most of the allegedly unauthorized orders.

Gerzen talked to Adamiec on July 17, 1996, and told Adamiec he was welcome to pick up copies of the company's evidence. The same day, Adamiec talked to DeWitt. Together, they reviewed the allegedly unauthorized order numbers and noticed some discrepancies between the numbers Fergus identified during the June 28th meeting and the numbers in the company memos. They discussed that the file lacked proof that Adamiec had placed the orders, and that it contained documents showing receipt of only two shipments, one of which was for an order that Fergus had never mentioned before. Def.'s Ex. 3.

Gerzen presented Adamiec's grievance to the Union Executive Board on July 19, 1996. He reviewed DeWitt's report of the Step 1/2A grievance meeting held on June 28th, as well as all the documents that the company produced on July 11th. Gerzen discussed each of the charges against Adamiec and explained how he believed they related to the facts reported in the company memos. Gerzen also summarized Fullman's surveillance report and Adamiec's security incident report. After this presentation, a majority of the Board voted to proceed to Step 2B. Def.'s Ex. 7.

The Step 2B meeting took place July 24th, 1996. Adamiec met with Gerzen and DeWitt beforehand to go over the charges. Def.'s Ex. 3. At the meeting, Gerzen peppered Fergus, Flanagan, and Fegan with questions about every charge. He asked for the identities of the informants mentioned in the memos, pointing out that "Adamiec has a right to face his accusers, and we have the right of discovery." Pl.'s Ex. L–2. Fergus refused to divulge his sources, stating that the company "has a record of confidentiality." Gerzen, Fegan, and Fergus then reviewed each one of the allegedly unauthorized orders in detail. Fergus listed the order numbers that the company attributed to Adamiec, and ex-

plained that the material ticket files were missing for all of them. Aware of the PIPS system, Gerzen requested the computer-generated documents reflecting these orders. He pointed out that it was unfair to blame the Crew Leader for missing material if another employee actually received the shipments. Fergus responded, "the fact is that [Adamiec] ordered without authorization."

Gerzen, Fegan and Fergus also discussed that welder Tom Keane had, in fact, placed a welding glove order originally thought to be unauthorized, but that an additional 24 pairs of these gloves were nonetheless found in an unsecured area of the storeroom. According to Fergus, Adamiec "should have taken care of this" in his capacity as Crew Leader.

Gerzen next asked about the charges regarding the alleged burglary. He inquired about alternative entrances to the storeroom—in particular, a service door near the tool room—and raised the possibility that someone else could have broken in unobserved. Referring to Fullman's report, Fergus replied that it was highly unlikely because "the area was checked every hour. The detective was 50 feet away from the storeroom door where there was little opportunity for anyone else to enter the service door. Besides, the detective could watch both doors." Pl.'s Ex. L–2. At the end of the meeting, Gerzen remarked that the company's evidence was purely circumstantial. He asked that Adamiec be reinstated. Fergus refused, and denied the grievance.

After the meeting, Gerzen prepared a written request for computer printouts of the allegedly unauthorized orders and asked again for the names of witnesses and informants. Def.'s Ex. 9. On July 30, 1996, the company complied. It provided computer printouts for orders with release numbers 530, 534, 555, 576, 580, and 585 (Root Brothers # 17945); and release numbers 6 and 8 (Midwest Welding Supply # 24437). With the exception of release 580, the information in these computer printouts conformed to what Fergus had recited at the June 28th and July 24th meetings. Adamiec was listed as the ordering employee, and the requesting departments, supplies, and dates matched

Fergus' description exactly. Release 580 listed William Brown as the ordering employee; however, Tom Keane had told Flanagan during his June 7th interview that Adamiec said he had canceled this order.

The printouts listed William Brown as the employee whom the materials were "received by." The company's letter also identified Brown as the employee who reported Adamiec's planned "break in," and Tom Keane as the person who had contacted Fegan with concerns about improper orders.

Gerzen met with Adamiec at the Union office on July 30th. According to Adamiec's notes, Gerzen was less than optimistic:

> [Gerzen] gave me copies of the orders. . . . He said he discussed the case with the Union attorney and said it doesn't look good. I asked that it go to the third step. He said it was up to the union board to vote on. They would probably do it Friday, August 2nd. Again, I told him I was not guilty of the charges against me. Tony also said the Company released the name of the person who said I was going to do the break-in. He is Bill Brown, the senior storekeeper who worked under me at North Shop. . . .

Def.'s Ex. 3.

Gerzen presented the new information about Adamiec's grievance to the Executive Board at its August 2nd meeting. Referring to his Step 2B meeting notes, Gerzen recounted what had occurred. He reviewed the contents of the most recently produced documents, and stated that he believed they were consistent with the company's position at the 2B meeting. In particular, Gerzen told the Board that his analysis of the computer printouts comported with the company's description of the allegedly unauthorized orders, as well as with Flanagan's June 7th interviews of union-member employees in the welding, carpenter, and tool shops. Gerzen also identified the informants by name and explained their role in the investigation. Gerzen related that Adamiec's sole response was that he was innocent.

In addition to Gerzen's presentation, Union official John Finnegan reported the results of his own union-member employee interviews.

Finnegan explained that he attempted to interview Brown twice, but that Brown refused to answer questions or make any statements about the Adamiec matter. Finnegan said he was able to interview welder Tom Keane, carpenter Bill Lambert, and tool keeper Tony Caracci. He reported to the Board that all three men expressed concern and anger that the storeroom had ordered supplies that they neither requested nor received. Following these presentations, the Board voted unanimously to drop Adamiec's grievance—two steps short of arbitration.

Adamiec wrote a moving letter to the Executive Board on August 28th, 1996, asking it to reconsider. Adamiec maintained that he did not stage a burglary, but rather discovered the storeroom seal broken when he arrived at work on May 29th. He pointed out that the seal was last checked almost an hour before he reported it broken, and that the company's surveillance did not cover the storeroom's second entrance. Adamiec also stated that he had received material request tickets for each of the allegedly unauthorized orders, that he had instructed Bill Brown to secure the welding gloves whose presence on the storeroom floor prompted the failure-to-control-stock charge, and that he never called a co-worker during his suspension to discuss the company's investigation. He pointed out that the company had no direct proof supporting its charges, and that all the evidence was traceable to Brown. Adamiec observed that Brown had equal access to storeroom files, was the person who tipped off Fegan to the burglary, and the person who reported the files missing. Thus, Brown could have easily disposed of the files containing the material tickets that would have exonerated Adamiec. Adamiec expressed his desire to present his case in arbitration, where the company would be subjected to a more demanding standard of proof. He reminded the Board about his unblemished disciplinary record and his seventeen-year union membership, asking for a chance to face his accusers. Def.'s Ex. 12.

The Board members received copies of Adamiec's letter at their September 9, 1996 meeting. In conjunction with the letter, the Board reviewed the evidence presented at its

July and August meetings. After discussing the matter, the Board voted unanimously to deny Adamiec's request for reconsideration.

## II. There Is No Evidence That the Union Acted Arbitrarily

### A. The Union Was Not Irrational to Drop Adamiec's Grievance After Step 2B

 "Our review of whether a union acted arbitrarily in deciding not to pursue a grievance or arbitration is 'highly deferential.'" *McKelvin*, 124 F.3d at 867 (quoting *O'Neill*, 499 U.S. at 78, 111 S.Ct. 1127). Applying this standard in view of the above facts, we cannot say that the Union's decision not to pursue Adamiec's grievance was "so far outside a wide range of reasonableness as to be irrational." *McKelvin*, 124 F.3d at 867 (internal quotations and citations omitted). Its position on the merits of Adamiec's grievance was certainly "colorable," *see id.* at 868, and the union far exceeded its duty to conduct a "minimal investigation" commensurate with the complexity of the case, *see Filippo*, 141 F.3d at 750. In short, the Union did not "process[ ] the grievance in a perfunctory manner," *Vaca*, 386 U.S. at 194, 87 S.Ct. 903, and this is borne out by the Union's actions during grievance meetings as well as its investigation of the company's evidence.

Union Steward DeWitt and Business Manager Gerzen were loyal and vigilant representatives. They defended Adamiec at the meetings with management; DeWitt asked that Adamiec be permitted to remain at work during the company's investigation, and Gerzen asked for Adamiec's reinstatement after Step 2B. Gerzen in particular asked probing questions at Step 2B to determine weaknesses in the company's case. He offered alternative explanations that would have exonerated Adamiec, and insisted that the company divulge the identities of its informants. Between meetings, both Gerzen and DeWitt both took the time to review and analyze the charges with Adamiec, and kept him informed about the status of his grievance. Gerzen was honest with Adamiec about the shortcomings of his grievance, instead of misleading Adamiec with false optimism. At the same time, there is no evidence that Gerzen

let these reservations color his representation of Adamiec vis-a-vis management.

In addition, the Union conducted a thorough investigation, and adopted a reasonable position on Adamiec's grievance after reviewing the evidence. After the Step 1/2A meeting, Gerzen demanded that the company produce documents supporting its allegations. The first batch of documents contained colorable evidence that there was no "break-in" at the North Shop on May 29th. Fullman's surveillance report left only 35 minutes for someone to enter the storeroom undetected and break the seal before Adamiec arrived. Memos in the file also implicated Adamiec in a plan to cover up his unauthorized ordering scheme: a source correctly predicted the May 29th "break-in" reported by Adamiec, and the missing completed order files corresponded to the order numbers that Adamiec allegedly placed without authorization. The reports of Flanagan's June 7th interviews portrayed employees denying that they requested the supplies in the allegedly unauthorized orders. Still, the company's materials did not include documents tying Adamiec to most of the orders, showed some discrepancies between the release numbers listed in the memos and Fergus' June 28th statement of the charges, and tied much of the proof to unidentified informants.

DeWitt discussed this evidence with Adamiec, then Gerzen presented it to the Executive Board at its July meeting, explaining how the evidence related to the complicated charges against Adamiec. Given some of the weaknesses in this evidence, the Board acted rationally in voting to proceed to the next step.

Having questioned Fegan and Fergus in detail at the Step 2B meeting, Gerzen made a document request targeted to discovering facts that he was unable to obtain at the meeting. This time, the company produced more persuasive documentary evidence against Adamiec. It provided Gerzen with computer printouts that identified Adamiec as the ordering employee for all of the allegedly unauthorized purchases. The information in these printouts, with one minor exception, matched exactly Fergus' earlier

descriptions. The company also identified its informants as Brown and Keane who, like Adamiec, were union employees. Union official John Finnegan then tried to interview Brown twice, but Brown refused to talk. Finnegan was able to talk to Keane, as well as to other employees identified in Flanagan's June 7th interviews as having denied requesting the orders that Adamiec had placed. The results of Finnegan's interviews were consistent with the company's.

Next, Gerzen and Finnegan presented the company's evidence and the interview results to the Executive Board at its August meeting. After discussing this evidence, the Board voted unanimously to deny Adamiec's grievance. Nevertheless, the Board took the time to review Adamiec's request for reconsideration at its September meeting, and analyzed it in conjunction with the evidence previously presented. Adamiec's letter did not address much of the evidence against him.

In sum, the Executive Board had before it colorable evidence that Adamiec placed orders that no one would admit to requesting, for supplies that were nowhere to be found, and for which all the paperwork was missing. In addition, the Board was aware that two union members had implicated Adamiec in a scheme to mask the unauthorized orders—a scheme that was supported by Fullman's surveillance report. In view of the overall strength of the circumstantial evidence in support of management's position, this Court cannot conclude that the Board's determination that Adamiec's grievance would not succeed in arbitration (making a Step 3 inquiry futile) was irrational. The Seventh Circuit's observations in *McKelvin*, a dropped-grievance case, are particularly pertinent in this respect:

> [T]rue or false, the union . . . had received Cinfio's [the plaintiff's supervisor] version of the story, which was that he had asked McKelvin to leave three times before being heeded. Although the need to make all factual inferences in McKelvin's favor requires us to disbelieve Cinfio's account on summary judgment, the question now before us is not whether a reasonable jury

could find that McKelvin was not insubordinate. Instead, we must consider whether a reasonable jury could conclude that the union's decision was irrational. McKelvin has not called into question the fact that the union was aware of Cinfio's account when it considered his case. Whether or not that version is accurate, then, it was before the union when it considered McKelvin's case, and the union was not irrational if it found that Cinfio's account was more credible and would undermine the union at arbitration.

124 F.3d at 868; *see also Vaca*, 386 U.S. at 195, 87 S.Ct. 903 ("[A] breach of the duty of fair representation is not established merely by proof that the underlying grievance was meritorious."). Likewise, we do not ask whether the company and informants' accounts are true or whether a reasonable juror could find Adamiec innocent of the company's charges; rather, we consider whether, given the evidence before the Union, its decision to drop Adamiec's grievance was irrational. We find that it was not.

**B. The CBA Did Not Require the Union to Take Adamiec's Grievance to Step 3**

Adamiec argues, however, that the Union had no discretion to drop his grievance before arbitration, regardless of its merit. He points out that the CBA's grievance procedures contain the following mandatory language:

> If the grievance is not satisfactorily adjusted in Step 1, it *shall* be discussed by the Union steward and/or the Business Manager of the Union and the local Superintendent and, if not satisfactorily adjusted, the Department Head. . . . If the grievance is not satisfactorily adjusted in Step 2, the Business Manager of the Union *shall* so notify the company in writing . . . the Company *shall* make an investigation and *shall* call a meeting. . . . If the grievance is not satisfactorily adjusted in Step 3, it *shall* be referred to arbitration upon request of either party.

Pl.'s Ex. A at 7–9. Citing case law that "shall means must," *see Hicks v. Miranda*, 422 U.S. 332, 352, 95 S.Ct. 2281, 45 L.Ed.2d

223 (1975), Adamiec contends that this language requires that each and every grievance be taken all the way to arbitration.

What Adamiec ignores, however, is that the "shall" clauses in each sentence are preceded by a condition—the grievance proceeds only *if* it is "not satisfactorily adjusted." The CBA defines this phrase: "the last decision given on any grievance *shall be considered a satisfactory adjustment unless* [within ten days of the last decision] *the grievance is carried to the next step."* Far from circumscribing the Union's discretion, the CBA thus presumes that a grievance has been satisfactorily adjusted if both the Union and the company—the only parties to the agreement—decide not to take the grievance to the next step. Nowhere does the agreement state that the employee must be satisfied with the result on a grievance. This makes sense because the employee is not a party to the CBA; his rights are vindicated through the Union, the exclusive bargaining representative of Peoples Gas employees. *See Vaca,* 386 U.S. at 191, 87 S.Ct. 903 ("[T]he settlement process [for grievances] furthers the interest of the union as statutory agent and as coauthor of the bargaining agreement in representing the employees in enforcement of that agreement.").

Adamiec's interpretation of the CBA's grievance provisions is also belied by his own evidence. His evidentiary submissions are legion with examples of grievances that never made it to arbitration. Adamiec presents discharge grievances that proceeded to Step 3, but were dropped before arbitration, *see* Pl.'s Ex. GG, and grievances challenging less serious discipline that survived only the Step 1/2A meeting, *see* Pl.'s Ex. II. There are no allegations that the Union's regular practice of handling these grievances amounts to a longstanding violation of the CBA

■■■ Finally, the Seventh Circuit has "held repeatedly that employees have no absolute right to have a grievance pursued to arbitration on their behalf: indeed, unions have consistently been accorded considerable discretion in deciding whether and to what extent employee grievances should be prosecuted." *Dahnke v. Teamsters Local 695,* 906 F.2d 1192, 1196 (7th Cir.1990) (internal quo-

tations and citations omitted). If a union "honestly believes [the grievance] lacks merit," it is justified in dropping the grievance before arbitration. *Id.* The Supreme Court explained the rationale behind this union discretion in *Vaca v. Sipes:*

> If the individual employee could compel arbitration of his grievance regardless of its merit, the settlement machinery provided by the contract would be substantially undermined, thus destroying the employer's confidence in the union's authority and returning the individual grievant to the vagaries of independent and unsystematic negotiation. Moreover, under such a rule, a significantly greater number of grievances would proceed to arbitration. This would greatly increase the cost of the grievance machinery and could so overburden the arbitration process as to prevent it from functioning successfully.

386 U.S. at 191–92, 87 S.Ct. 903. The Court concluded that "a union does not breach its duty of fair representation, and thereby open up a suit by the employee for breach of contract, merely because it settled the grievance short of arbitration." *Id.* at 192, 87 S.Ct. 903.

In short, the plain language of the CBA between the Union and Peoples Gas does not mandate that every grievance reach arbitration, and this interpretation is consistent with the Union's longstanding practice and the dictates of federal labor law. As such, the CBA's provisions cannot support a finding of arbitrariness.

**C. Adamiec's Remaining Arguments Merely Address the Merits of His Grievance, Not the Union's Arbitrariness**

The bulk of Adamiec's brief is an attempt to establish his innocence rather than lodge an effective attack on the Union's representation. For example, he spends a great deal of time trying to show that someone could have broken into the storeroom on May 29th without having been detected by Fullman. Referring to an elaborate diagram and photographs of the North Shop premises, Adamiec points to alternative entrances to the storeroom, and questions Fullman's ability to

see activity at the North Shop's front door from his surveillance vantage point. Adamiec also points to a security guard's log from May 29th, which appears to show that Fullman left the company parking lot much earlier than the time stated in his report. None of this, however, changes the fact that Fullman reported that he observed the storeroom seal intact at 6:30 a.m., said Adamiec was the first to arrive on the premises at 7:05 a.m., and that Adamiec admittedly reported the seal broken shortly thereafter. Although this evidence is not impenetrable, the Union could have rationally concluded based on Fullman's report that the chances of a real break-in were remote indeed, especially in light of Brown's tip about Adamiec's plan to stage a break in and Fegan's discovery that files for the allegedly unauthorized orders were removed beforehand. Moreover, the Union had no reason to question the accuracy of Fullman's report; thus, it had no duty to examine the security guard's log from May 29th.

Adamiec's response to the unauthorized order charge is equally ineffective to sully the Union's representation. Relying on the company's working draft of allegedly unauthorized orders—a document that was not before the Union when it voted on Adamiec's grievance—Adamiec seizes on the fact that some of the orders listed were placed by other employees, including Brown. But none of these orders served as the basis for Adamiec's termination; with the exception of one order placed by Brown that Adamiec reportedly canceled, the company charged Adamiec only with the orders that he initiated. Next, Adamiec turns to the fact that Brown was listed as the "received by" employee on all the computer printouts of the allegedly unauthorized orders, and argues from this that the missing supplies should be attributed to him. However, it is undisputed that the person listed as the "received by" employee is not necessarily the employee who physically received the delivery.[7] Furthermore, Fergus specified that it was the unauthorized orders, not the missing material, that prompted Adamiec's discharge. Under these circumstances, the Union could have rationally determined that the company's evidence of unauthorized ordering was too strong to challenge in arbitration.[8]

The only well-founded substantive argument that Adamiec lodges against the Union's representation is its failure to obtain a statement from informant William Brown.[9] Nevertheless, we cannot say that the Union acted arbitrarily in this respect, because Union official Finnegan attempted to interview Brown twice without success. The Union did not have subpoena power; it could not force Brown to talk if he did not want to. Moreover, it is clear from Brown's testimony in this action that interviewing him would not have furthered Adamiec's case. Brown's deposition is consistent with his confidential statements to the company. *See Smith v. McDonnell Douglas Corp.*, 107 F.3d 605, 608 (8th Cir.1997) ("Absent from Smith's allegations is any suggestion of what a further investigation might have revealed that would have aided him in any way. Smith identifies no witnesses that would corroborate his version of the highway incident or absolve him of responsibility. . . ."). The Union was also entitled to refuse to badger one if its own

---

7. Plaintiff's counsel misrepresents the record with her repeated assertion that Brown testified "he would not have received the material if the material tickets were missing at the time he received the items." *See* Pl.'s Br. at 13. Brown testified to nothing of the sort.

8. Adamiec raises other, less substantial, arguments in attempt to establish the merits of his grievance. For example, he challenges aspects of the evidence supporting the company's failure-to-control-storeroom-stock charge, as well as the charge of insubordination for contacting a co-worker about the company's investigation. We do not address these points because, as explained above, the merits of Adamiec's grievance are not at issue here. In any event, it is clear that these were not the primary charges prompting Adamiec's discharge, and the Union could have rationally concluded that the evidence substantiating the false report and unauthorized ordering charges was sufficient to undermine Adamiec's grievance.

9. Plaintiff's counsel makes a feeble attempt to challenge the credibility of the company informants, Brown and Keane, with accusations of company property theft that are totally unsupported by the evidence. More significant than the utter lack of evidentiary support for these assertions, however, is the undisputed fact that the Union never heard about them before this litigation.

members in attempt to exonerate another. *See Garcia,* 58 F.3d at 1176 ("The union represents the majority of employees, even while it is representing a single employee in a grievance process. Thus even during an individual grievance procedure, the union's own credibility, its integrity as a bargaining agent and the interests of all its members may be at stake. The union is therefore entitled to enjoy a somewhat different perspective than the individual employee it represents in a grievance matter.").

Finally, the two cases Adamiec cites are easily distinguishable because they involve egregious violations of employee rights. In *Bennett v. Local Union No. 66, Glass, Molders, Pottery, Plastics & Allied Workers,* 958 F.2d 1429 (7th Cir.1992), the union retroactively extended an employee's probationary period after promising it would not do so. This deprived the employee of the collective bargaining agreement's protections, permitting management to terminate her summarily. The union then refused to conduct any investigation or to pursue a grievance. The court found that the union acted "intentionally, in a deceitful scheme to deprive Bennett of her protected status under the collective bargaining agreement." *Id.* at 1436. There is no evidence of such deceit or blatant sacrifice of contractual rights in this case. In equally stark contrast to this case is *Lewis v. Tuscan Dairy Farms, Inc.,* 829 F.Supp. 665 (S.D.N.Y.1993), which involved a Union President who unilaterally ignored collective bargaining agreement provisions, sacrificed the seniority rights of an entire plant of workers, and then mislead them about their fate.

Based on our exhaustive review of the Union's actions on Adamiec's behalf, we conclude that no reasonable juror could find evidence of arbitrary behavior. Summary judgment is therefore in order on the arbitrariness component of the fair representation standard. We now move on to determine whether Adamiec has produced evidence of discrimination or bad faith on the Union's part.

### III. No Reasonable Juror Could Find that the Union's Actions Were Discriminatory or Taken in Bad Faith

To establish the Union's breach of the duty of fair representation based on claims of discrimination or bad faith, Adamiec must " 'point to specific facts that support' " a jury finding of " 'improper motive.' " *Cintron v. Sysco Food Servs.,* 1997 WL 457500, at *5 (N.D.Ill. Aug.7, 1997) (quoting *United Steelworkers v. Rawson,* 495 U.S. 362, 372, 110 S.Ct. 1904, 109 L.Ed.2d 362 (1990)). Adamiec claims improper motive based on: (1) the Union's allegedly more favorable treatment of similar grievances; and (2) Gerzen's statement in a 1991 grievance proceeding that "in the past, discharge grievances always go to the 3rd step." Neither point has merit.

On the first, Adamiec's evidence is wholly inadequate. Adamiec's brief asserts that grievances similar to his "received more attention, investigative effort and have been pursued through arbitration." Pl.'s Br..at 22. In support of this, he presents a list of employees whose discharge grievances the Union took to Step 3 or on to arbitration. But Adamiec provides nothing from which the Court can discern substantive similarities, or differences in union attention or investigative effort. All we have are documents recording the Union Executive Board votes on these grievances, the first and last pages of some arbitration decisions, and reports of disciplinary action that do not describe the facts underlying the employees' discharges. From this, we cannot tell the depth of the Union's investigation, the quality of its representation, or the strength of the evidence against the employees who filed these grievances. In short, this evidence does not permit any kind of similarity assessment.

The only exception to this is the discharge grievance of Alex Porrata, which the Union took to arbitration. Adamiec provided the Court slightly more detail on Porrata's grievance; nevertheless, the details belie any similarity to Adamiec's case. Adamiec was discharged for allegedly placing unauthorized orders over a several-month period and then staging a break-in to conceal evidence of wrongdoing. Porrata, however, was fired for a one-time incidence of stealing company steel plates and damaging a company truck

in the process. While Porrata's offense could be considered just as grave as Adamiec's, the company's evidence implicating Porrata was much weaker. He was charged solely on the identification of a non-union security guard, and produced four alibi witnesses to rebut the identification. The Union also believed that it was physically impossible for Porrata to have singlehandedly loaded five half-ton plates onto a company truck, and, based on a company reenactment, the Union had reason to question whether this activity could have caused the type of damage that the truck had sustained. Finally, there is no indication that the company's evidence against Porrata included any documentary evidence.

In contrast, considerable documentary evidence supported the unauthorized ordering and false burglary report charges against Adamiec, and a number of union-member coworkers implicated Adamiec in both endeavors. Moreover, the physical evidence supported the company's charges—the material tickets for the unauthorized orders were missing, and Fullman's surveillance showed a high likelihood that Adamiec had staged the May 29th break-in. Based on this evidence, no reasonable juror could conclude that the Union acted irrationally or discriminatorily in deciding to take Porrata's, but not Adamiec's, grievance to arbitration.

Finally, Gerzen's statement in a 1991 grievance proceeding that "in the past, discharge grievances always go to the 3rd step" does not create a fact issue in light of the undisputed evidence that the Union has since abandoned this practice. Since 1994, the Union has dropped eight discharge grievances after Step 2B, and dropped five discharge grievances after Step 2A. Def.'s Ex. 2. Thus, even if we accepted Adamiec's invitation to determine a difference in treatment based solely on steps reached in the grievance process, Adamiec's treatment was actually more favorable than at least five of his fellow employees'.

■ The evidence of the Union's bad faith is equally insufficient to withstand summary judgment. Adamiec speculates that "one explanation" for the Union's decision to drop his grievance "is that Adamiec had previously been off on a worker's compensation claim." Pl.'s Br. at 26. As evidence that the two are connected, he relies solely on another discharged employee's letter to the Union complaining that Peoples Gas discriminated against him based on his receipt of workers compensation benefits. Needless to say, a different employee's complaint about discrimination by Peoples Gas is hardly probative here. Adamiec also raises the possibility that the Union dropped his grievance in retaliation for his participation on a committee formed to improve employee/management relations. He claims that Gerzen protested the formation of this committee, believing that it would usurp the Union's role as exclusive bargaining agent. Again, Adamiec has no evidence whatsoever that this negatively affected the Union's handling of his grievance. See Filippo, 141 F.3d at 750 (granting summary judgment on bad faith because "Filippo has provided us with no evidence linking Birkholtz's personal feelings to the Union's handling of her grievances."); McKelvin, 124 F.3d at 868–69 ("McKelvin has offered no evidence suggesting that Rhodes' anger affected his representation of McKelvin."). The observations of the court in Trnka v. Local Union No. 688, United Auto., Aerospace & Agric. Implement Workers, 30 F.3d 60, 63 (7th Cir.1994) are particularly apt:

> In the district court, Trnka contended that the union dropped his grievance in retaliation for his past criticisms of union leadership and policies, stretching over almost two decades. He cited no evidence of this supposed retaliation beyond the bare assertions that his criticisms took place. To stave off summary judgment in a case where innocent or multiple explanations for a defendant's actions abound, a plaintiff must rely on more than post hoc, propter hoc reasoning.

Perhaps the most telling evidence on the issue of improper motive is the following admission from Adamiec's deposition:

Q: Well, is there any reason that you know of why the Union would want to single you out for bad treatment as compared to other members?

A: To the best of my recollection, I would say no, I don't know of any reason.

Def.'s Ex. 14, at 36. *Cf. Hill v. Sanford Corp.*, 1997 WL 164002 (N.D.Ill. Mar.27, 1997) (finding no evidence of bad faith or discrimination where plaintiff admitted that he "knows of no motive why the Union discriminated against him"). In light of all the evidence before us, we cannot say that the Union acted discriminatorily or in bad faith. As such, summary judgment must be granted on the final two components of the fair representation standard.

## CONCLUSION

This Court is deeply saddened by Adamiec's circumstances. He was a long-time Peoples Gas employee and a Union member in good standing, who had obviously performed well enough to attain a position with supervisory responsibilities. Before 1996, his disciplinary record was unblemished. In light of this, the company's manner of imposing discipline did not afford Adamiec the dignity he deserved. To suddenly summon Adamiec to a conference room and suspend him indefinitely without any explanation of the charges was unfair and inhumane. But the company's actions are not the issue here—we are considering only the Union's conduct. And our examination of the evidence demonstrates that the Union's handling of Adamiec's grievance was not irrational, and was not motivated by discrimination or bad faith.

Consequently, we must grant summary judgment to both defendants on Adamiec's LMRA section 301 claim, because his case against the company was dependent on establishing the Union's representational breach. The Clerk of Court is directed to enter judgment, pursuant to Fed.R.Civ.P. 58, in favor of the defendants and against the plaintiff.