**Michael McKELVIN, Plaintiff–Appellant,**

**v.**

**E.J. BRACH CORPORATION and Grocery and Food Products, Processors, Canner-ies, Frozen Food Plants, Coffee Vend-ing, Miscellaneous Drivers and Sales-men, Warehousemen and Related Office Employees, Union Local 738, Interna-tional Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Defendants–Appellees.**

**No. 96–1602.**

United States Court of Appeals, Seventh Circuit.

Argued Nov. 8, 1996.

Decided Sept. 2, 1997.

---

James L. Blowers (argued), Bowers & Palmer, Chicago, IL, for Plaintiff–Appellant.

Gregory J. Malovance, Brian M. Montgomery (argued), Winston & Strawn, Chicago, IL, for E.J. Brach Corp.

Thomas E. Johnson, Anne M. Davis (argued), Johnson, Jones, Snelling & Gilbert, Chicago, IL, for Grocery and Food Products, Processors, Canneries, Frozen Food Plants, Coffee Vending, Misc. Drivers and Salesman, Warehousemen and Related Office Employees, Union Local 738, Intern. Broth. of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

Before EASTERBROOK, MANION and ROVNER, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

Michael McKelvin was employed by candy-maker E.J. Brach Corporation from October 1983 until November 1993, when he was discharged. After being dismissed from his employment, McKelvin sued under section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, alleging that his union, Local 738, International Brotherhood of Teamsters, had breached its duty of fair representation and that Brach had violated the collective bargaining agreement. The district court granted summary judgment in favor of the defendants. McKelvin appeals, and we affirm.

## I. Background [1]

During his last three years at Brach, McKelvin held the position of boiler room utility person, supervised by John Cinfio. In November 1993, McKelvin was on first shift, which ran from 6:30 a.m. until 3:00 p.m. On Friday, November 19, 1993, McKelvin asked Cinfio if he could take the following Monday off in order to accompany his pregnant wife to a 1:00 p.m. appointment with her physician. Cinfio suggested that instead of losing the day, McKelvin come in early so that he could complete his shift before the appointment. As for the details of the modified schedule, McKelvin testified that Cinfio "didn't say no specific time," but merely directed, "Mike whatever you do, just write it down to show the time you worked." (McKelvin Dep. at 43.) On Sunday, McKelvin mistakenly understood from his wife that her appointment was at 8:45 a.m. on Monday instead of 1:00 p.m. With this understanding (although the appointment was indeed scheduled for 1:00 p.m.), McKelvin decided to work the third shift on Sunday night, which ran from 10:30 p.m. until 7:00 a.m. Monday. He did not clear this particular schedule with Cinfio, but kept a record of the work he performed in accordance with his understanding of Cinfio's instruction.

When Cinfio arrived at 6:40 a.m. Monday, however, he was surprised to see McKelvin and asked who had approved the change in shifts. McKelvin said that he thought Cinfio had authorized him to work whenever he wished. McKelvin apologized for the misunderstanding and offered to forfeit his pay for the night. Cinfio told McKelvin to go home, but McKelvin expressed fear about leaving before the end of the shift. McKelvin then heard Cinfio direct him to go see John Klepper, the industrial relations manager. Cinfio does not recall telling McKelvin to go see Klepper, but believes that he asked McKelvin to leave for a second time and that he told McKelvin to call Klepper from home at 10:00 a.m. [2] Consistent with his own understanding of the conversation, however, McKelvin did not go home, but went to Klepper's office to await his 7:00 a.m. arrival. When Cinfio saw McKelvin sitting outside of Klepper's office, he again told McKelvin to leave. At that point, McKelvin went to the employee locker room to change his clothes in preparation to go home. Unfortunately, he encountered Cinfio for a third time before taking his leave. Cinfio asked why McKelvin was still in the building, and despite McKelvin's explanation, demanded that McKelvin surrender his identification badge, which was necessary for entrance to the plant. On his way out, McKelvin encountered Klepper in the parking lot. He told Klepper what had transpired, and Klepper asked him what he had done with his identification badge. McKelvin recalls saying that he gave it to Cinfio, but Klepper reported that McKelvin had untruthfully responded that the badge was in his locker.

McKelvin then contacted his union representative, Walter Rhodes, who scheduled a meeting with Cinfio and Klepper for the following day. Rhodes instructed McKelvin not to speak at the meeting but merely to apologize to Cinfio. Still, McKelvin did speak up once or twice to contradict Cinfio's version of events. When Cinfio said that he had asked McKelvin to go home three times,

---

1. There are some disagreements as to the factual history. For purposes of defendants' summary judgment motion, we accept McKelvin's version.

2. Although we accept McKelvin's account for purposes of defendant's summary judgment motion, Cinfio's version is also relevant because there is no dispute that it was available to the union when it considered McKelvin's case.

McKelvin stated that he had only heard two requests to leave. At that point, Rhodes told McKelvin that he had been insubordinate by not leaving when so directed. Klepper again asked McKelvin where his identification badge was, and McKelvin told him that he had given it to Cinfio. Klepper accused McKelvin of lying, recounting that McKelvin had originally told him that the badge was in his locker. Klepper then announced that McKelvin was fired.

On November 29, 1993, Rhodes gave McKelvin a termination letter from Brach, which stated that McKelvin had been fired for various rules violations including insubordination. Rhodes instructed McKelvin on filing a grievance form and told him that it must be completed by December 6. He suggested that McKelvin include a letter from the doctor verifying his wife's appointment. On December 5, McKelvin gave Rhodes a three-page document entitled "Formal Complaint," which did not comply with the grievance format. A letter from the doctor was attached but did not indicate the time of the appointment. McKelvin told Rhodes that he had already submitted the complaint to Brach's management. Rhodes then copied the complaint verbatim onto a grievance form so that it could be filed. He told McKelvin to get a new letter from the doctor verifying that the appointment had been at 8:45 a.m., but McKelvin told him that would be dishonest because the appointment had been at 1:00 p.m. Rhodes called the doctor's office himself to learn that the clinic had not opened until 12:30 p.m. on November 22.

In accordance with established procedure, a grievance meeting was held on December 16, 1993, with Klepper, Cinfio, Rhodes and McKelvin in attendance.[3] Klepper denied the grievance, and, also consistent with the union's standard procedure, Rhodes sent McKelvin's file to the union's outside counsel for a recommendation about whether the union should seek an arbitration. In a January 3, 1994 letter to Rhodes, union attorney Donald Cohen recommended that arbitration not be pursued. Cohen believed that because

McKelvin had been insubordinate and had lied to management the union would not succeed at arbitration. Rhodes informed McKelvin of the union's decision not to arbitrate in a January 6, 1994 letter.

## II. Duty of Fair Representation

■ In order to state a claim against the union for breach of its duty of fair representation, a plaintiff must establish that the union's action was arbitrary, discriminatory, or taken in bad faith. *Air Line Pilots v. O'Neill*, 499 U.S. 65, 67, 111 S.Ct. 1127, 1129, 113 L.Ed.2d 51 (1991); *Souter v. International Union, UAWA, Local* 72, 993 F.2d 595, 598 (7th Cir.1993). McKelvin does not assert that the union's actions were discriminatory, but argues that they were both arbitrary and taken in bad faith, contentions that we will address in turn.

### A. Arbitrariness

■ Our review of whether a union acted arbitrarily in deciding not to pursue a grievance or arbitration is "highly deferential." *Air Line Pilots*, 499 U.S. at 78, 111 S.Ct. at 1135. A union's actions are deemed arbitrary only if they are "so far outside a 'wide range of reasonableness' as to be irrational." *Air Line Pilots*, 499 U.S. at 67, 111 S.Ct. at 1129 (citation omitted); *Garcia v. Zenith Electronics Corp.*, 58 F.3d 1171, 1176 (7th Cir.1995). In applying this extremely deferential standard, we will " 'not substitute [our] judgment for that of the union, even if, with the benefit of hindsight, it appears that the union could have made a better call.' " *Garcia*, 58 F.3d at 1176 (quoting *Ooley v. Schwitzer Division*, 961 F.2d 1293, 1302 (7th Cir.), cert. denied, 506 U.S. 872, 113 S.Ct. 208, 121 L.Ed.2d 148 (1992)). "This wide degree of deference is warranted because Congress did not intend courts to interfere with the decisions of the employee's chosen bargaining representative." *Ooley*, 961 F.2d at 1302. In applying this standard at the summary judgment phase, we have explained that "so long as a colorable argument could

---

**3.** The collective bargaining agreement set out a three-step grievance procedure, the final step of which included involvement of the industrial relations department. Because industrial relations manager Klepper was already involved in McKelvin's case, however, the grievance proceeded immediately to step three.

be made at the time of the union's decision to drop its support that the grievance is meritless (and the union did not then treat substantively similar grievances differently from the plaintiff's), the decision cannot be regarded as arbitrary." *Trnka v. Local Union No. 688*, 30 F.3d 60, 61 (7th Cir.1994). McKelvin's burden on summary judgment, in other words, is not just to establish that his position is as plausible as the union's, but to show that the union's position "could eventually be deemed not even colorable[.]" *Id.*

McKelvin has not met that burden here. Even taking all factual inferences in McKelvin's favor, as we have done in our factual summary, the union's position cannot be deemed irrational. In accord with the union's standard procedure, Rhodes sent McKelvin's case to the union's outside counsel for an opinion on whether to seek an arbitration. Attorney Cohen concluded that McKelvin had been insubordinate and had lied to management, and therefore opined that the union would not succeed at arbitration. That opinion was certainly "colorable" based on the evidence with which Cohen had been presented. First, even according to McKelvin's own version of the facts, Cinfio had told him to leave the plant twice before he did so. Although perhaps a harsh assessment, that account is enough to support the charge of insubordination. And, true or false, the union and Cohen had received Cinfio's version of the story, which was that he had asked McKelvin to leave three times before being heeded. Although the need to make all factual inferences in McKelvin's favor requires us to disbelieve Cinfio's account on summary judgment, the question now before us is not whether a reasonable jury could find that McKelvin was not insubordinate. Instead, we must consider whether a reasonable jury could conclude that the union's decision was irrational. McKelvin has not called into question the fact that the union was aware of Cinfio's account when it considered his case. Whether or not that version is accurate, then, it was before the union when it considered McKelvin's case, and the union was not irrational if it found that Cinfio's account was more credible and would undermine the union at arbitration. The same reasoning applies to McKelvin's

supposed "lies" about the time of his wife's appointment and the location of his identification badge. It is undisputed that the union had information suggesting that McKelvin had lied. It was not irrational for the union to conclude that an arbitrator might be persuaded by that information.

## B. Bad Faith

McKelvin has also failed to raise a question of material fact as to whether the union's decision was made in bad faith. Unlike the inquiry into arbitrariness, which requires an objective assessment of the union's actions, allegations of bad faith "require[ ] inquiry into the subjective motivation behind union action." Here, McKelvin relies on three statements by Rhodes as evidence of bad faith. First, he points to the fact that Rhodes himself accused McKelvin of insubordination at the November 23, 1993, meeting between Rhodes, McKelvin, Klepper and Cinfio. McKelvin also highlights two statements from Rhodes' deposition. In a discussion of the November 23 meeting, Rhodes stated:

> But what he said about the I.D.—I was personally getting angry when I heard about the two other times with the—being told to go home [by Cinfio on Monday morning] because it's like you don't tell your doctor. I'm trying to help him.

> And for me to go in and try to defend his position and everything and I don't know what's going on-all I did was wind up feeling silly....

(Rhodes Dep. at 51.) In addition, in response to a question about whether he told attorney Cohen that McKelvin had lied to management, Rhodes answered, "[t]he only thing I referred to was that he lied to John Clepper [sic] about his I.D." (Rhodes Dep. at 85.)

This evidence alone does not suffice to raise a factual question as to whether Rhodes or the union acted in bad faith. First, the fact that Rhodes was angry with McKelvin for not disclosing to him all relevant information before the November 23 meeting does not support an inference of bad faith because McKelvin has offered no evidence suggesting

that Rhodes' anger affected his representation of McKelvin. Indeed, the evidence suggests that Rhodes followed every prescribed procedure in McKelvin's case. He called a meeting with management to seek McKelvin's reinstatement, he instructed McKelvin on the most advantageous way to conduct himself at the meeting (quietly), he showed McKelvin how to file a grievance, he put the grievance into proper form when McKelvin failed to do so, he filed the grievance, and he sent McKelvin's case to the union's attorney after the grievance had been denied. There is not a single responsibility that Rhodes failed to perform in his representation of McKelvin. Although acknowledging McKelvin's insubordination at a meeting with management may have reflected poor judgment or less than zealous advocacy, the evidence supported this charge, and Rhodes' acknowledgment of this fact when management itself had already done so certainly cannot be said to indicate bad faith. In *Souter*, 993 F.2d at 598–99, we found that "negative comments" about the employee's claim "showed only that the union questioned the merit of Souter's grievance, not that it treated Souter with hostility or in bad faith." The same reasoning applies here. McKelvin has offered no evidence to support the charge that Rhodes acted in bad faith.

### III. Breach of CBA

In order to succeed on a section 301 claim against an employer for breach of its collective bargaining agreement, the employee must first establish that the union breached its duty of fair representation. *Brazinski v. Amoco Petroleum Additives Co.*, 6 F.3d 1176, 1179 (7th Cir.1993); *White v. General Motors Corp.*, 1 F.3d 593, 595 (7th Cir.1993). *Souter*, 993 F.2d at 599. As we explained in *Brazinski*, 6 F.3d at 1179:

> When as in this case the collective bargaining agreement establishes a grievance procedure for processing claims for breach, with arbitration if the grievance procedure does not produce a satisfactory result, and the union is cast in the role of representative of the aggrieved worker in the grievance and arbitration processes, the worker cannot prevail in his section 301 suit merely by showing that his grievance is a just

one. That is, he cannot show just that the company violated the collective bargaining agreement. He must also show that by arbitrarily refusing to press his grievance the union violated its duty to represent all members of the bargaining unit fairly.

Because McKelvin has failed to make that showing here, his claim against Brach must also fail.

### IV.

The district court's grant of summary judgment in favor of defendants is AFFIRMED.