**Terrance A. TREUER, Plaintiff,**

v.

**SHOP–RITE, INC. d/b/a/ Pick 'N Save Warehouse Foods and United Food and Commercial Workers Union, Local No. 1444, Defendants.**

No. 97–C–0585.

United States District Court, E.D. Wisconsin.

Jan. 8, 1999.

Frank Terschan, Milwaukee, WI, for Plaintiff.

Naomi Soldon, Scott Soldon, Oyvind Wistrom, Allen Levy, Milwaukee, WI, for Defendants.

### DECISION AND ORDER

ADELMAN, District Judge.

On May 3, 1996, an employee of defendant Shop–Rite, Inc. (doing business as "Pick 'N Save Warehouse Foods"), improperly weighed and labeled T-bone steaks. Plaintiff Terrance A. Treuer, a co-employee, did not report this error to the employer. As a result, Shop–Rite fired Treuer. Until his discharge, Treuer had been employed for about ten years as a meat-cutter at Shop–Rite, pursuant to the terms of a collective bargaining agreement (CBA) between Shop–Rite and Treuer's union, defendant United Food and Commercial Workers Union Local 1444. Among the provisions of the CBA in

effect at the time of Treuer's termination were several indicating that employees may be fired only upon "just cause."[1] Treuer sues Shop–Rite for breach of the termination provisions of the CBA and he sues the union for failure to represent him fully and fairly before the employer by taking his grievance to arbitration. Both employer and union have filed separate, but related, motions for summary judgment. For the reasons set forth below, both motions will be denied.

## I. THE FACTS

At the time of the events leading to his termination, Treuer worked as a "journeyman meat-cutter" for Shop–Rite at its Sunset Street Pick 'N Save grocery store in Waukesha, Wisconsin, having worked his way up from "apprentice meat-cutter"[2] to "journeyman meat-cutter." The journeyman position was defined in the CBA as follows:

> A journeyman is a skilled meat cutter who has served his apprenticeship in accordance with a period of time set forth in this agreement. His or her skills shall consist of the ability to order, receive, handle, prepare, cut, cure, grind, slice, process, wrap, display and sell beef, veal, lamb, pork, poultry, sausage or fish, whether frozen, cooked, smoked, barbecued or irradiated, and the performance of all work incidental thereto, including the cleaning of all power equipment, tools and the work area. As part of his or her duties, he or she may be required to perform any or all of the above listed functions.

(CBA at 29.) Shop–Rite asserts that this definition was not the exclusive source of the journeyman meat-cutter job description, however, and Treuer admits that he, as well as other journeyman meat-cutters, also historically assisted apprentice meat-cutters when problems or questions arose.[3] It is undisputed, though, that as part of his job Treuer was involved in all facets of meat preparation, including cutting, packaging and weighing meat for sale to the public.

The process of packaging cut meat at the Sunset store involved a machine called a "Hobart" machine, which weighed and priced packaged meat. To account for the weight of the packaging material—Styrofoam tray, soaker pad and plastic wrap—the Hobart machine needed to be programmed with a "tare" weight allowance, which resulted in the subtraction of the weight of the packaging material from the total weight so the customer was charged for meat only. The tare weight allowance varied depending on the specific type and size of packaging material being used.

As a journeyman meat-cutter, Treuer was aware of the importance of packaging meat with the proper tare weight allowance and that specific laws regulated weighing and pricing meats. Treuer had been employed in another store when a state inspector noticed that certain steaks were improperly weighed and required that the meat be repackaged and repriced. Treuer also was familiar with the wrapping process and knew how to manually override the Hobart machine so that it reflected the proper tare weight allowance.

At work in the early afternoon of May 3, 1996, Treuer was packaging T-bone steaks along with apprentice meat-cutter Jason

---

1. *See, e.g.,* CBA Art. III § 1(F)(1) (seniority broken by discharge for just cause), Art. VII § 3 (grievance procedure does not prohibit employer from discharging any employee for just cause), Art. XV (employer has exclusive right to suspend or discharge an employee for just cause).

2. The CBA defines the apprentice position as follows:

> An apprentice must be eighteen (18) years of age or older, learning all the details and developing the skills for performing the duties of a meat cutter. The company agrees to assign each apprentice to various jobs in order to give him/her the opportunity to qualify as a meat cutter at the end of forty-eight (48) months.

(CBA at 29.)

3. By the terms of the CBA job descriptions, assistance to apprentices is implied as being part of the job of head meat-cutter:

> The head meat cutter is a person assigned to run the department at store level and shall be a qualified journeyman meat cutter. Because of the greater working skill and experience, the head meat cutter must possess, he/she shall in the performance of their work direct, organize, and control the movements and operations of the less skilled employees in the department.

(CBA at 29.)

Quinlan and journeyman meat-cutter David Mortle. According to Treuer and Mortle, journeyman meat-cutter Bill "Otto" Bauer also was working with them. (Defendants say, however, that Bauer either told them he was not in the room at the time or else was unaware of what was happening.) Treuer was sawing the T-bone steaks, Mortle was next to him trimming the steaks with a knife, Bauer (accepting Treuer's version that Bauer was present) was on the other side of Mortle scraping and placing the steaks in styrofoam trays, and Quinlan was last in line after Bauer, wrapping and weighing using the Hobart machine. A few feet separated each of the employees in the line, with Treuer and Quinlan the furthest apart.

After packaging approximately fifty steaks, Quinlan noticed and announced, in a tone louder than a conversational tone, that the Hobart machine was improperly set at a "0" tare and that he was changing it to a ".06" tare. Quinlan testified, though, that on May 3, 1996 he in fact had not been certain of the proper tare weight allowance, but he knew zero was certainly wrong—the packaging had to weigh something.[4] Quinlan did not expressly ask for help in correcting the tare reading, nor did he expect anyone to come over and help him do anything to fix it.

Quinlan did not go back and repack or relabel the fifty or so improperly weighed steaks nor did he mark those packages to inform others that the weights were incorrect. In fact, none of the employees in the cutting room, except perhaps Mortle, took any steps to prevent the improperly weighed steaks from making their way into the cooler for sale to the public. Mortle says he told Quinlan to reweigh the already-packaged steaks, although Quinlan's testimony contradicts Mortle on this point, and that he attempted to find meat manager Jim Borders, but was not able to locate him. It is undisputed that unless store management was informed about the miscalculations there was no way for the management to discover the problem from simply examining the labeling of the packaged meat.

Treuer, the furthest away from Quinlan, admits that over the noise of the saw he heard Quinlan announce the incorrect zero tare and then heard someone say the machine should be set at six. Treuer also admits, though, that he did nothing to remedy the situation and continued sawing T-bone steaks. He did not help to correct the setting on the machine, repack the improperly weighed meat, ensure that the meat was not made available to the public, or notify Borders, whom he believed was present at the store at the time of the infraction. Treuer says he thought that when Mortle left the room for a while perhaps he had gone to tell management,[5] he assumed Quinlan knew how to and had corrected the problem, and in addition he did not think it was his responsibility to do anything about it.

Quinlan testified that he put the packaged steaks on a cart that went into the meat cooler. The ordinary procedure at the store for display of steaks was "first in/first out" of the meat cooler.

Treuer, Quinlan, and Mortle all worked until about 2:30 p.m., as Borders specifically told them not to put in overtime. Bauer's shift lasted past the others, and he remained at the store for several more hours.

At approximately 3:30 p.m. on May 3, 1996, the Wisconsin Department of Agriculture, Trade and Consumer Protection (WDATCP) received a telephone call reporting that a tare weight infraction occurred at the Sunset store that afternoon. Although he did not give his name to the WDATCP, Mortle placed the call. As a result of the call an investigator from the State of Wisconsin appeared at the store later that day and found displayed for sale a number of improperly weighed T-bone steaks, in violation of state law. The potential penalty to the Sunset store for the tare weight infraction of May 3, 1996 was approximately $600,000.

---

4. The proper tare weight allowance for T-bones being packaged on May 3, 1996 was actually .03, so Quinlan went from overcharging the customers to undercharging them.

5. At the time, however, Treuer did not know for a fact that Mortle had gone looking for the meat manager; Mortle told him only after the events of May 3 had unfolded.

Shop–Rite conducted an investigation into the tare weight violation. Greg Leifer was the union's business representative for the Sunset store. On or about May 8, 1996, Leifer became involved in the investigation and participated in numerous meetings with the individuals involved in the May 3, 1996 incident, as well as company representatives. Leifer spoke with each of the four employees questioned by Shop–Rite before their interviews with the store's investigator on May 13, 1996, and was there to represent and assist the employees during questioning.

In their interviews with Shop–Rite's investigators, Treuer, Mortle, and Quinlan all admitted to Shop–Rite that they were present in the cutting room during the May 3, 1996 incident. Shop–Rite was looking for the individual who placed the call to the WDATCP, but none, including Mortle, admitted making it. Treuer stated at the interview that he went directly home after work on May 3. Shop–Rite threatened Treuer with fines of up to $32,000, a nine-month suspension, a civil suit, and possible criminal prosecution.

Treuer and Mortle and were placed on an unpaid suspension effective May 14, 1996. Even though Treuer had come in on his day off and answered the investigator's questions, the reason given for his suspension, as well as Mortle's, was failure to cooperate with the investigation. The union filed grievances challenging the action, and Leifer advised Mortle and Treuer to file for unemployment compensation benefits. Afterward, Leifer had ongoing discussions with company representatives seeking to have Treuer brought back to work with full back pay.

On June 3, 1996, Treuer, Mortle and Quinlan were terminated due to their involvement with the tare weight infraction. Shop–Rite's official reasons for Treuer's termination were stated in a termination letter:

> Pick 'N Save has determined that you were aware that product was run with the wrong tare weight, but you failed to report this to your manager or other store supervision [sic], and thereby, placed Pick 'N Save in violation of Wisconsin Statutes

pertaining to tare weights. As a result, Pick 'N Save suffered actual financial damage and was and continues to be exposed to future damage by your reckless disregard for the foreseeable consequences of your actions .... Your conduct constituted a breach of Pick 'N Save's work rules and policies but, more important, it represented a breach of a basic and fundamental condition of your employment: loyalty to the business interest of your employer. Accordingly, as a result of your conduct and its actual and potential ramifications, Pick 'N Save is constrained to terminate your employment.

(Turowski Aff., Ex. A.) Shop–Rite did not discipline Bauer, who at all times denied any knowledge of the tare weight violation.

On June 6, 1996, the union converted Treuer's and Mortle's suspension grievances into ones challenging the termination, and filed a grievance on behalf of Quinlan. Leifer participated in further meetings and interviews with Treuer, Mortle, Quinlan, and other store employees. At some point Shop–Rite obtained WDATCP's telephone records showing that Mortle placed the tip-off call, and, according to Leifer, during one meeting in July 1996, Mortle indicated that Treuer had gone to Mortle's house after work on May 3, suggesting that Treuer was present when Mortle called the WDATCP. Leifer also obtained a legal opinion indicating that Shop–Rite likely would prevail at arbitration. Leifer did not, however, review personnel files of any of the employees, time cards regarding Bauer in particular, or security tapes to see if they identified who placed the mislabeled steaks on display.[6] Leifer did not contact Treuer's wife to verify that Treuer went home immediately after work on May 3 or attempt to determine who had preprogrammed the Hobart machine for a zero tare reading.

Leifer, though, did continue conversing with the company and pushing for Treuer's reinstatement with full back pay. The discussions led to a proposal by Shop–Rite on or about June or July 12, 1996, which provided

---

**6.** According to defendants, Leifer probably did ask Shop–Rite to see the security videotapes, but the company refused.

that the company would pay Treuer $15,000 and he would be reinstated, although at a different store owned by an independent operator. The deal was not finalized. Treuer found it unacceptable; he told Leifer he wanted his "job back." In addition, Shop–Rite's position was that it would either settle all three grievances or none at all, and Mortle had already rejected his offer. Meanwhile, the union and Shop–Rite went through a selection process for assigning an arbitrator to Treuer's case.

During this time period, Leifer also represented Treuer, Mortle and Quinlan in their respective unemployment compensation appeal hearings. During the first day of hearings, August 13, 1996, Mortle still denied that he called the WDATCP, but Shop–Rite presented telephone records showing otherwise. At the start of the second day of hearings, September 30, 1996, Leifer brought Treuer a new offer from Shop–Rite, referred to as the "Last Chance Settlement Agreement and General Release." The proposal provided that Treuer's seniority would remain intact, he would work at a corporate store other than the Sunset store, and Shop–Rite would drop its appeal of Treuer's unemployment compensation benefits, but if a similar incident regarding a tare weight infraction recurred, Treuer would be terminated without recourse to the grievance system, and Treuer had to waive any right to sue the union or Shop–Rite over the matter.

The last chance agreement was independent of settlement proposals offered to Mortle and Quinlan—at some point Shop–Rite had dropped the "all or none" settlement requirement. While Treuer's proposed settlement agreement varied significantly from Mortle's, it was virtually identical to Quinlan's. Quinlan accepted his deal. Quinlan, though, had committed a previous tare weight violation back in October 1995, and possibly had signed a tare weight policy sheet before May 3, 1996. In regard to Mortle, Shop–Rite refused to offer him reinstatement, but agreed to an early retirement package and disability pension and refrained

from challenging his unemployment benefits eligibility. Mortle eventually accepted his deal as well.

When Leifer presented Treuer with the last chance agreement on September 30, 1996, Leifer read through each paragraph with Treuer and asked Treuer whether he had any questions about the settlement proposal. Treuer, though, refused to sign, thinking it too harsh because he would not get back pay and could be terminated without recourse.[7] According to Treuer, Leifer then became hostile and intimidating and screamed and swore for five or ten minutes. Treuer states that Leifer said such things as: "I put my ass on the line for you," "I don't even have to take you to arbitration," and "I don't even know if I can even represent you." Treuer indicated he wanted an attorney to look at the agreement "[a]nd that's when he got more hostile and stuff and stated that he put his ass on the line for me and this is the best they can come up with." (Treuer Dep. at 96.) Treuer asserts that he told Leifer he wanted to go to arbitration and Leifer, in a rage, told Treuer he would make sure Treuer's grievance never went to arbitration. Leifer denies that he became hostile and says he merely recommended that Treuer take the deal and informed Treuer that Leifer would recommend that the grievance not be arbitrated. I take Treuer's version as true for present purposes, however.

The CBA set forth a grievance procedure by which union representatives and Shop–Rite officials first were to attempt to settle each grieved matter. (CBA art. VII § 1(A) & (B).) In the event settlement attempts failed, "the matter shall be submitted" to arbitration. Despite this mandatory language, however, the CBA also provided that the union's executive board "ha[d] the right to determine whether or not the employee's grievance is qualified to be submitted to arbitration by the Union." (CBA art. VII § 1(F).) The parties do not dispute that the more specific language of section 1(F) controls. The union's constitution and bylaws

---

7. The parties have differing interpretations of what Treuer meant or what Leifer understood when Treuer said he wanted his "job back." Although mentioned often, the details of that dispute are immaterial for present purposes. All that is important is that Leifer thought the last chance agreement did obtain Treuer's "job back" and Treuer thought it did not.

echo that the executive board has the sole authority to make final decisions regarding arbitration; thus, union representatives like Leifer may make only recommendations to the board.

At some point Treuer decided to hire his own attorney, Gary Williams, for advice. Williams on several occasions asked the union's counsel and Leifer why they felt Treuer's arbitration could not be won; Williams expressed his view that the union and Treuer would succeed at arbitration. According to Williams, Leifer, union officials and the union's attorney kept saying they had good reasons for not arbitrating, but refused or were reluctant to pass those reasons or supporting evidence on to Williams. Leifer, though, apparently did tell Williams that Treuer had given inconsistent testimony during his unemployment compensation hearing and that Mortle had implicated Treuer in the wrongdoing. Leifer told Treuer that the union was worried that Mortle would not be a good witness in an arbitration case. Apparently, Williams eventually was given the tapes or transcripts from the unemployment compensation benefits hearings for his own review.

On October 10, 1996, Treuer challenged Leifer's adverse recommendation to the union's executive board. Williams (with the union's knowledge) and Shop–Rite continued settlement discussions, which culminated in revisions to the last chance agreement to reflect the specific company-owned store to which Treuer would be assigned and the new fact that Treuer had been denied unemployment compensation benefits.

Treuer's request for arbitration was to be heard at the next executive board meeting.

Williams asked that either he or Treuer be allowed to attend the meeting personally, but the request was denied by union president and executive board member Daniel R. Welch; the union's standard procedures, by-laws and constitution did not provide for personal appearances before the board and Welch knew of no exceptions to the rule. Welch, however, did allow Treuer to—and Treuer did—submit to the board a written letter setting forth his position regarding his grievance and asking that the matter proceed to arbitration.[8] Treuer admitted at deposition that there were no facts, arguments or issues that he failed to put into his letter to the board.

The executive board met on November 19, 1996, at which time Leifer summarized the circumstances surrounding Treuer's discharge, answered questions from the board, and recommended that the grievance not be taken to arbitration. After Leifer left the meeting, the executive board considered the matter and voted not to arbitrate but rather to settle Treuer's grievance by accepting the last chance agreement on Treuer's behalf, which it had authority to do.[9] Treuer admits that the executive board "carefully reviewed all of the evidence and arguments presented by both Mr. Leifer and Mr. Treuer." (Union's Proposed Findings of Fact ¶ 31 (unopposed).)

Treuer thereafter filed this case in May 1997 under section 301 of the Labor Management Relations Act, 29 U.S.C. § 185. The case was initially assigned to Magistrate Judge William E. Callahan, but was reassigned to me upon my appointment as district judge.[10]

---

8. In his brief opposing summary judgment, Treuer suggests Welch did not forward Treuer's letter to the board members. Treuer, though, has no evidence to support that accusation and the burden was his—he for instance could have deposed Welch or another executive board member on the issue.

9. The union thought that by its acceptance of the agreement Treuer retained any individual rights he had against the company, which was one of his concerns. The union pursued a separate grievance for Treuer relating to Shop–Rite's alleged violation of the last chance agreement.

10. In reviewing the documents in this case, I noted that I am mentioned in paragraph 45 of Treuer's August 14, 1997 affidavit, which was prepared for the National Labor Relations Board; the affidavit is attached as exhibit A to document 43. In the affidavit, Treuer testifies that

> [o]n about 1/14/97, Mortle spoke with State Representative Lynn Adelmann about the WDATCP report. The State Representative's office indicated to Mortle that the Employer and WDATCP were sleeping together. Mortle also said that the State Representative's office also provided him with the open records statute. I mailed a copy of the WDATCP report to

## II. SUMMARY JUDGMENT STANDARD

As is well known, summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The mere existence of a factual dispute does not defeat a summary judgment motion; "the requirement is that there is a *genuine* issue of *material* fact." *Id.* at 247–48, 106 S.Ct. 2505. "Material" means that the factual dispute must be outcome-determinative. *Contreras v. City of Chicago,* 119 F.3d 1286, 1291 (7th Cir.1997). " '[F]acts not outcome-determinative under the applicable law, though in dispute, may still permit the entry of summary judgment.' " *Id.* at 1292 (quoting *Wainwright Bank & Trust Co. v. Railroadmens Fed. Sav. & Loan Ass'n,* 806 F.2d 146, 149 (7th Cir.1986)). Whether a material issue of fact is "genuine" necessarily requires some qualitative determination of sufficiency of the evidence. To defeat a properly supported motion for summary judgment, the opposing party must present specific and sufficient evidence that, if believed by a jury, could actually support a verdict in its favor. Fed.R.Civ.P. 56(e); *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. A "metaphysical doubt" as to the facts is insufficient to defeat a motion for summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); · *Regensburger v. China Adoption Consultants, Ltd.,* 138 F.3d 1201, 1205 (7th Cir.1998). "A district judge faced with [a summary judgment] motion must decide ... whether the state of the evidence is such that, if the case were tried tomorrow, the plaintiff would have a fair chance of obtaining a verdict. If not, the motion should be granted and the case dismissed." *Palucki v. Sears, Roebuck & Co.,* 879 F.2d 1568, 1572–73 (7th Cir.1989) (citations omitted).

## III. ANALYSIS

### A. Treuer's Claims

 Treuer sues Shop–Rite for wrongful discharge under the terms of the CBA. He also sues the union for breach of its duty to represent him fairly in his grievance before the employer, making his lawsuit a so-called "hybrid" action. In a hybrid lawsuit the employee's claims against the union and employer are interlocked. Because in the CBA the employer and union, on behalf of its members, agreed to a grievance and arbitration procedure as the exclusive way of obtaining a remedy for breach of the contract, Treuer is bound by those terms. *See Vaca v. Sipes,* 386 U.S. 171, 184, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). Nevertheless, an employee covered by a CBA may seek judicial enforcement of his contractual rights when the union has the sole power to invoke the higher stages of the grievance or arbitration procedures and the union wrongfully fails to do so. *Id.* at 185–86, 87 S.Ct. 903. Treuer

---

the Governor's Office in about 9/96. Mortle spoke with someone in the Governor's Office, who recommended that Mortle contact Adelmann.

Even assuming that the WDATCP report to which Treuer refers regards the inspection of May 3, 1996, and disregarding the fact that Treuer is testifying to something that *Mortle* did and the hearsay of something thereafter related to Mortle (and ignoring the fact that the affidavit gets both my former title—state senator—and the spelling of my name wrong), I do not believe this mention of my office merits my recusal from this case under 28 U.S.C. § 455(a) or (b)(3). In regard to section 455(b)(3), if Mortle did indeed call I have no recollection of speaking with him directly, and it was my practice to let my staff members deal with such constituent concerns. There is no reference to any action my office, let alone I personally, took. In regard to section 455(a), the parties obviously do not think my impartiality may reasonably be questioned, as I have had this case for more than one year yet they never raised the issue. (Paragraph 45 was never referenced by either party and was buried in a thick attachment to one of plaintiff's attorney's affidavits.) At the final pretrial conference held on January 6, 1999, all parties confirmed that they see no conflict justifying reassignment of the case.

thus can win his lawsuit against Shop–Rite only if he first proves that the union as bargaining agent breached its duty of fair representation toward him. *See id.* at 186, 87 S.Ct. 903.

## B. The Union's Duty of Fair Representation

■■■ As the exclusive bargaining representative of the employees in Treuer's bargaining unit, the union had a statutory duty to fairly represent all of those employees in its enforcement of the CBA. *Vaca,* 386 U.S. at 177, 87 S.Ct. 903.[11] A breach of a union's duty of fair representation occurs only when the union's conduct toward a member of the collective bargaining unit is "arbitrary, discriminatory, or in bad faith." *Id.* at 190, 87 S.Ct. 903. Plaintiffs may argue each component separately. *See Garcia v. Zenith Elecs. Corp.,* 58 F.3d 1171, 1176 (7th Cir.1995); *Ooley v. Schwitzer Div., Household Mfg. Inc.,* 961 F.2d 1293, 1302 (7th Cir.1992). Here, Treuer pursues only the arbitrariness and bad faith prongs.

### 1. Arbitrariness

■■ A union's actions are arbitrary "only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness,' . . . as to be irrational." *Air Line Pilots Ass'n v. O'Neill,* 499 U.S. 65, 67, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991). Whether a union's actions are arbitrary requires inquiry into the objective adequacy of union action. *Trnka v. Local Union No. 688, United Auto. Workers,* 30 F.3d 60, 63 (7th Cir.1994); *see Air Line Pilots,* 499 U.S. at 73–78, 111 S.Ct. 1127.

■■ Treuer asserts first that the union acted arbitrarily by not "conduct[ing] a complete investigation into the circumstances of Treuer's termination." (Pl.'s Br. in Opp. at 10.) A union must provide "some minimal investigation of employee grievances," *Garcia,* 58 F.3d at 1176 (internal quotation

marks omitted); it acts arbitrarily if it ignores an employee's complaint or processes a grievance in a perfunctory manner, *see Vaca,* 386 U.S. at 194, 87 S.Ct. 903. But "the thoroughness of this investigation depends on the particular case, and 'only an egregious disregard for union members' rights constitutes a breach of the union's duty.' . . . What is required to be shown goes considerably beyond the requirements of a malpractice suit." *Garcia,* 58 F.3d at 1176 (quoting *Castelli v. Douglas Aircraft Co.,* 752 F.2d 1480, 1483 (9th Cir.1985)). The union is not held to the standard of the ideal lawyer. *Garcia,* 58 F.3d at 1178.

■■ On the facts of this case Treuer cannot establish that the union gave his complaint only perfunctory investigation or consideration. Treuer's union representative, Leifer, became involved the week after the tare weight events occurred and remained involved for over six months, attending the employer's investigative interviews of Treuer, negotiating at least two versions of settlement agreements on Treuer's behalf, and representing Treuer at the unemployment compensation hearing. In his brief opposing summary judgment, Treuer admits that Leifer "spent a considerable amount of time on the case." (Pl's Br. in Opp. at 6.) The union went so far as to initiate the arbitration procedure by beginning the selection of the arbitrator and, as is undisputed, "carefully" considered the matter of whether Treuer's grievance should go to arbitration as opposed to ending with the last chance agreement. Even taking all inferences in Treuer's favor, the union's time commitment and amount of activity on his behalf were not inadequate.

Neither was the substance of Leifer's investigation inadequate. Treuer attacks Leifer's completeness, asserting that Leifer should have reviewed personnel records, looked at Bauer's time cards, obtained and reviewed security tapes to find out who put the misweighed meat into the display case,

---

**11.** While the collective bargaining system as set up by Congress by necessity subordinates the interest of an individual employee to the collective interests of all employees in the bargaining unit, "the duty of fair representation has stood as a bulwark to prevent arbitrary union conduct against individuals stripped of traditional forms of redress by the provisions of federal labor law." *Vaca,* 386 U.S. at 182, 87 S.Ct. 903.

and investigated who set the Hobart machine at zero. It is undisputed that Bauer's time cards would have shown only that he was in the store, not exactly where in the store he was, thus they were irrelevant to the investigation and matter before the executive board. The same is generally true of the Hobart programming and security tapes, as finding someone else also potentially culpable would not have changed the fact that Treuer, Mortle, and Quinlan all left the store without correcting the tare weight violation or informing management. Personnel records likewise are irrelevant regarding what Treuer, Mortle, and Quinlan did or did not do on May 3, 1996. Although they may have revealed to Leifer and the executive board that Quinlan had a prior tare weight infraction (it is unclear whether they knew that fact already) and therefore should have been more careful or should have known to report the incident, adding further justification for Quinlan's termination, they would not have changed Shop–Rite's view that the actions of Mortle and Treuer constituted just cause. As stated above, the union is not held to the standard of an ideal lawyer and only an egregious disregard of its investigative duties violates the duty of fair dealing. Here, the additional benefit to Treuer, Leifer, and the executive board of having one more item showing that Quinlan may have been more deserving of termination than Treuer or Mortle was minimal at best. Leifer's failure to look at any of these items simply was not an egregious error in investigation.

Next, Treuer argues that the union acted arbitrarily in accepting the last chance agreement rather than going to arbitration, because the arbitration could not be lost. This argument collapses the union's and the employer's possible liability into one discussion, as it brings into question the merits of the grievance itself, and, therefore, the issue of whether the CBA was breached at all.

■ A union does not breach its duty of fair representation merely because it settled a grievance short of arbitration. *Vaca,* 386 U.S. at 192, 87 S.Ct. 903. An individual employee has no absolute right to have his grievance taken to arbitration unless the CBA so provides, *Vaca,* 386 U.S. at 191, 87

S.Ct. 903, which, here, by virtue of Article VII section 1(F) of the CBA, it does not. Instead, again, the court still looks at whether the union's representation of the employee was adequate. *See Air Line Pilots,* 499 U.S. at 73–78, 111 S.Ct. 1127.

"[I]n cases such as this where the employee complains that the Union breached its duty of fair representation by refusing to take the grievance to arbitration, the court must look at least to the arguable merits of the grievance, which necessarily involves looking at the contract." *Crider v. Spectrulite Consortium, Inc.,* 130 F.3d 1238, 1241–42 (7th Cir.1997). The court may even examine the terms of a CBA or settlement agreement in search of evidence that a union did not adequately represent its member. *See Air Line Pilots,* 499 U.S. at 74, 111 S.Ct. 1127.

■ Review of whether a union acted arbitrarily in deciding not to pursue a grievance or arbitration is "highly deferential." *Air Line Pilots,* 499 U.S. at 78, 111 S.Ct. 1127; *McKelvin v. E.J. Brach Corp.,* 124 F.3d 864, 867 (7th Cir.1997). Courts should not substitute their judgment for that of the union, even if, with the benefit of hindsight, it appears that the union could have made a better call. *McKelvin,* 124 F.3d at 867; *Ooley,* 961 F.2d at 1302. Because the union represents the majority of employees, even while it represents a single employee in a grievance proceeding, the union's own credibility, integrity as a bargaining agent and the interests of all its members are considerations the union may take into account. The union therefore is "entitled to enjoy a somewhat different perspective than the individual employee it represents in a grievance matter." *Garcia,* 58 F.3d at 1176.

■ A union's decision that a particular grievance lacks sufficient merit to justify arbitration does not constitute a breach of the duty of fair representation merely because a judge or jury would find the grievance meritorious. *See Vaca,* 386 U.S. at 192–93, 87 S.Ct. 903. The question before me is not whether a reasonable jury could find that Shop–Rite violated the CBA, but instead whether a reasonable jury could conclude that the union's decision not to arbitrate was

irrational. *McKelvin*, 124 F.3d at 868. Arbitrary or irrational does not mean "just possibly incorrect." *See Trnka*, 30 F.3d at 62. With the high degree of deference given to the union, "so long as a colorable argument could be made at the time of the union's decision to drop its support that the grievance is meritless (and the union did not then treat substantively similar grievances differently from the plaintiff's), the decision cannot be regarded as arbitrary." *Id.* at 61. The employee-plaintiff's burden on summary judgment

> is not merely to demonstrate that his favored reading of the labor contract is as plausible as the union's, thus creating an issue of material fact regarding the correct interpretation, but rather to show that the union's reading could eventually be deemed not even colorable, thus creating an issue of material fact regarding arbitrariness.

*Trnka*, 30 F.3d at 61–62. In other words, Treuer must sufficiently support a finding of "the manifest incorrectness of the decision as an assessment of the merits of the grievance at the time it was made." *Id.* at 62.

■■■ I believe Treuer has met this high standard, allowing him to survive summary judgment on the possible arbitrariness of the decision to settle rather than arbitrate. The CBA does not define "just cause." Nor does it state anywhere that "loyalty to the business interest of your employer" is a "basic and fundamental condition of your employer," as quoted from Treuer's termination letter. Further, although it is undisputed that pursuant to custom, journeymen meat-cutters assisted apprentices, pursuant to the CBA, such assistance was a required job duty only of head meat-cutters, not journeymen. Nothing in the CBA itself requires journeymen to correct every mistake made by an apprentice. Therefore, Treuer's failure to report or correct Quinlan's error does not violate any express provision of the CBA.

Certain definitions, concepts, and rules of law are implied by or incorporated into the CBA, however. As Shop–Rite itself recognizes, "[j]ust cause is a flexible concept that embodies notions of equity and fairness." (Br. of Def. Shop–Rite at 18 (citing *Crider*, 130 F.3d at 1242).) "[F]or a penalty to be just it must be in keeping with the seriousness of the offense." *Crider*, 130 F.3d at 1242 (internal quotation omitted). And I am willing to assume that although no duty of loyalty is explicitly provided in the CBA such a duty does exist—a remaining question, however, is what that duty entails.

The Pick 'N Save Employee Handbook provides some guidance as to what constitutes just cause and what the duty of loyalty includes. The handbook contains a section on employee honesty and integrity, but speaks only to an employee's responsibility to advise management of thefts of merchandise or other company property and to handle sums of money and confidential information honestly. Violation of that policy, under the terms of the employee handbook, justifies termination. The "Guidelines of Discipline" attached to the handbook list several other offenses and their resulting discipline. Theft of company property, like the failure to report others' thefts, is cause for termination. But the infractions sounding most like what Treuer did—failure to report defective equipment, shortage/overage (although likely targeted at cashiers not meat-cutters), and substandard quality of work (what Quinlan was written up for in October 1995)—all merit only a reprimand on the first offense and some even on the second offense, with termination not occurring until at least the fourth infraction.

The handbook also sets forth Shop–Rite's general use of three levels of discipline. First, a written reprimand could issue "[a]dvising an employee of certain actions that were not acceptable to established operating policies .... This is the first step of discipline to be administered." (R. at 40, Ex. C at 21.) Next, an employee would receive a disciplinary lay-off without pay. (*Id.*) And, lastly, an employee would be terminated: "This is the final step of discipline and is to be followed after the first two means of counseling have not corrected the employee's behavior, and when the offense is of such a serious nature that it requires this action at the first offence." (*Id.*, Ex. C at 22.)

These provisions from the handbook suggest that just cause for termination of em-

ployment at Shop–Rite's store could range from very serious offenses such as theft and the failure to report theft to the accumulation of smaller infractions, and that the duty of loyalty to the employer includes the duty to report direct losses of merchandise or money. The Guidelines of Discipline, though, show that the small infractions meriting mere reprimands generally were not just cause for termination or considered serious breaches of any duty of loyalty.

Shop–Rite contends that Treuer showed a "flagrant disregard for the business interest of his employer." (Reply Br. of Def. Shop–Rite at 7.) But Treuer has presented even other evidence that Shop–Rite's reaction to his infraction—failure to report "Quinlan's tare weight violation—was not "in keeping with the seriousness of the offense" as understood at the time—evidence that his failure to report did not rise to such a serious level as to merit termination". Treuer has presented evidence that he was terminated for failing to report or correct an error that itself merited only a warning or written reprimand not only by the terms of the employee handbook but in practice as well. An employee contact sheet regarding Quinlan's October 1995 tare weight violation indicated that "[o]n 10–24–95 Jason was wrapping meat, using wrong tares on packages. Jason must use correct tares on all packaged meat at all times. If he does not know the tares for meat product boats he should ask his supervisor." Quinlan received a verbal warning for his October 1995 error and was warned that if the incident occurred again he would get a written reprimand. (R. at 40, Ex. A.) Quinlan appears to have done the same thing on May 3.

Together, the handbook and the discipline sheet for Quinlan's prior infraction show that Treuer's termination for failing to report a tare weight violation was excessive. Unlike the situation of theft, for which termination is the punishment for the offender and for anyone failing to report it, all of this evidence shows that consistent with the CBA and handbook, tare weight violations themselves

usually merited mere verbal warnings or written reprimands. Yet Treuer's failure to report such a violation or correct its results, according to defendants, constituted just cause for termination?

The difference between a tare weight violation such as Quinlan's in October 1995 and that of May 3, 1996, says Shop–Rite, was that the May 3 incident was not caught internally,[12] but instead resulted in the involvement of the WDATCP and a fine, which cost Shop–Rite money and made the matter public and therefore likely more serious in the eyes of the employer. It is undisputed that Shop–Rite wanted to know who made the call to the WDATCP. But while Mortle's call to the WDATCP rather than his employer may indeed be considered a violation of an implied duty of loyalty, Treuer did not do that. From his standpoint, his failure to report Quinlan's May 3 error was just a passive disregard of another's mistakes, not an intentional act to get his employer in trouble. Neither the CBA nor the handbook put Treuer on notice that this type of passive failure to report another's mistakes would constitute such disloyalty as to justify termination. If just the commission of the tare weight violation is as serious as Shop–Rite suggests, then harsher treatment merely because the WDATCP actually finds out about the problem is unjustified.

The union says there was a possibility that Treuer was actively disloyal, as Mortle at one point during the investigation suggested that Treuer was with him when the call to the WDATCP was placed, although Mortle later recanted that story. Mortle's implication of Treuer and poor credibility are the main factors the union gave Williams and now gives to me for its decision not to arbitrate Treuer's case. According to Leifer, Mortle's story kept changing and his testimony would be damaging at an arbitration hearing.

But who would call Mortle as a witness? If the union thought Mortle would be a bad witness, it would not call him. But from the union's standpoint, changes in Mortle's story should have helped Treuer, as they made the

---

**12.** There is no proof, by the way, as to whether Quinlan's October 1995 mistake was corrected

before meat was displayed or sold to the public.

truth of his suggestion that Treuer was with Mortle when he called the WDATCP even less likely. Shop–Rite likely would not call Mortle either, as Mortle exhibited signs of hostility toward his employer by informing the WDATCP of the tare weight violation rather than notifying the employer first, and gave as his reason the fact that in his experience the company would not do anything about tare weight violations anyway.

The union apparently also gave to Williams the excuse that Treuer's own testimony at his unemployment compensation hearings was inconsistent with other statements, although the union now has dropped that explanation for its failure to arbitrate and currently points to no specific contradictions made by Treuer himself.

Finally, the union indicated that Treuer's admission that he did nothing to correct the tare weight violation made winning at arbitration unlikely. But adding up the fact that the CBA and employee handbook do not expressly require workers to report their coworkers' infractions or impose a duty of loyalty on each employee to police all other employees' violations of law or policy; the fact that under the CBA and in prior practice first-time tare weight violations themselves usually merited only a verbal warning or written reprimand; and the fact that Mortle likely would not have been a witness at the arbitration, and, if he had testified, would probably have testified favorably to Treuer and his recanted testimony placing Treuer at the scene of the call would hardly have been credible; I think the union should easily have won Treuer's arbitration.

That takes us then to the last chance agreement and whether accepting it was rational in light of the fact that a win at arbitration was virtually guaranteed; the union says that it thought the last chance agreement was a pretty good deal in light of the uncertainty of arbitration. Through the last chance agreement Treuer retained his seniority and position as journeyman meatcutter at a company-owned store—equivalent to what he would have obtained at arbitration. The last chance agreement, however, indicated that the period of his suspension would remain marked in his personnel records as being a disciplinary suspension and final warning, meaning not only that Treuer received no back pay for that time but also that he had a serious blot on his employment record. This permanent stain on his record is a significant change for someone who, the evidence indicates, did nothing violative of the CBA or his job description. Most importantly, though, the last chance agreement provided that any "similar conduct" would result in immediate discharge. Although Treuer would be able to challenge the facts related to any such accusation, an arbitrator would have no authority to modify the penalty. It is this last matter that clinches my assessment that the last chance agreement gave up substantial rights that Treuer would have retained had he won at arbitration.

The union argues to me that its decision not to arbitrate cannot have been arbitrary because it also refused to arbitrate Mortle's or Quinlan's grievances. It appears, though, that Quinlan accepted his last chance agreement before the others, so the union never had to make an arbitration choice regarding him. In addition, Treuer was not in substantially the same position as either of the other men, and therefore the comparison is unpersuasive. Taking the facts in Treuer's favor, Quinlan committed the violation, had committed a similar violation before yet had not learned from it, did not know the correct tare for T-bone steak packaging yet set the Hobart machine to .06 anyway, failed to report the problem to his supervisor as he had been instructed after the October 1995 violation, and knowingly allowed the incorrectly marked steaks to be put into the meat cooler for rotation into the display case. On these facts, he was clearly more culpable than Treuer in the incident and therefore the last chance agreement—identical to Treuer's— was justified. Mortle was the senior employee in the cutting room, made the call to the WDATCP rather than notifying Shop–Rite first, and his changing story labelled him a liar and possible saboteur, justifying settlement of his grievance as well. Treuer had none of these problems. On the facts of this case it was more arbitrary to treat him just like the other two than it would have been to treat him individually.

I am not merely saying that I, or a jury, could reasonably find the grievance meritorious. I am saying instead that, taking all facts in Treuer's favor, the union's success was virtually guaranteed and the defendants have made no colorable or rational argument supporting the union's decision to settle the grievance through the last chance agreement rather than taking it to arbitration. The union's decision to settle the grievance on terms that were substantially less than Treuer could have received had he won at arbitration was manifestly incorrect and thus irrational.

A union's decision not to arbitrate a meritless grievance can rarely, if ever, be considered irrational or arbitrary. *Ooley*, 961 F.2d at 1302. This case is the opposite end of the spectrum. Treuer's grievance clearly was not meritless. Here, again taking all facts in Treuer's favor, where the union chose not to arbitrate a grievance that had so much merit it was a virtually guaranteed winner, the decision was indeed irrational and arbitrary. I recognize that because of the extremely deferential standard of review, unions rarely lose summary judgment motions regarding arbitrariness, but they do not as a result have unfettered power to drop grievances having extremely strong merit. The claim will proceed to trial.

### B. Bad Faith

▆▆▆ Unlike the objective analysis of arbitrariness, allegations of bad faith trigger inquiry into the subjective motivation behind union action. *Trnka*, 30 F.3d at 63. Summary judgment is generally inappropriate where questions of motive and intent are in dispute, but if the union sufficiently demonstrates facts that belie the claim that its conduct was improperly motivated, the employee must come forward with sufficient contradictory evidence from which a reason-

able jury could infer an unseemly intent. *Richardson v. Kraft–Holleb Food Serv., Inc.*, 774 F.Supp. 1108, 1111 (N.D.Ill.1991), *aff'd*, 998 F.2d 1016 (7th Cir.1993).

▆▆ Treuer first asserts that Leifer's hostility on September 30, 1996 and afterward through the decision to settle rather than arbitrate [13] establishes the bad faith necessary to survive summary judgment— according to Treuer Leifer grew to have a personal stake in denying Treuer the right to go to arbitration. A union's refusal to handle a grievance on the basis of personal animosity violates the duty of fair representation. *Conn v. GATX Terminals Corp.*, 18 F.3d 417, 420 (7th Cir.1994); *see Ooley*, 961 F.2d at 1303 ("[T]he union representatives put their personal interests ahead of the plaintiffs' interests. Such self-protectionist motives are not appropriate for fiduciaries.").

Whether in fact Leifer turned on Treuer when Treuer refused to sign the last chance agreement on September 30, 1996, is definitely disputed. Treuer states that Leifer yelled profanities at him, stated that he could not represent him any longer, and heatedly threatened to make sure Treuer's grievance never went to arbitration, while Leifer says he never raised his voice at Treuer or threatened him at all.

But even assuming that Treuer's version is true, Leifer's anger by itself does not mean that the *union* acted in bad faith.[14] Leifer did not make the decision not to press Treuer's grievance to arbitration; Leifer could make only a recommendation to the union's executive board. It is undisputed that the executive board had the final authority as to whether Treuer's grievance would go to arbitration, and Treuer has presented no evidence that even one member of the executive board was affected by any hostility Leifer felt toward Treuer.[15] In *Conn*, the

---

**13.** At deposition Treuer admitted that prior to September 30, 1996, Leifer had expressed no hostility toward him. And since the denial of arbitration Leifer and the union pursued a separate grievance for Treuer and Treuer has no complaints about bad faith in that matter.

**14.** Shop–Rite contends that Leifer was merely making forth comments about the merits of Treuer's case, which cannot justify a bad faith

finding. I reject that argument. Leifer's tone transformed any statement about the merits into hostility that can be considered.

**15.** Williams's testimony indicates he told union president Welch about Leifer's hostility, but no evidence establishes that Welch concurred with Leifer's reaction or that his own opinion was in any way affected by that knowledge.

Seventh Circuit held that even if a union representative's animus underlies a recommendation not to arbitrate, the union does not breach its duty of fair representation where the union's executive board makes its own assessment of the case and decides not to arbitrate. *Conn*, 18 F.3d at 420. "[T]he causal element that is a required part of every tort case is missing." *Id.*

With one exception, the present case in this regard is the same as *Conn*. The exception is that Conn appeared before the board in person to tell his story, whereas here Treuer was not allowed to make such a personal plea. I find that difference immaterial. Treuer has conceded that his letter to the board contained his entire explanation and argument and there was nothing substantive that he would have added if he had appeared in person before the board. Similar to the situation in *Conn*, Treuer does not suggest that union representative Leifer withheld or misrepresented any of the actual facts or prevented the executive board from exercising a truly independent judgment. See also *McKelvin*, 124 F.3d at 868–69, in which the fact that the union representative was angry did not support any inference of bad faith where no evidence suggested that the anger affected representation of the employee. The causal element between Leifer's anger and the board's decision therefore is missing.

■■■ If Leifer's hostility on September 30, 1996, was all Treuer had to go on, the bad faith claim would fail. *Other* evidence, though it is scant, does suggest, however, that the board did act against Treuer based on animosity when deciding not to arbitrate Treuer's grievance.

Faced with his situation back in 1996, Treuer hired himself an attorney, which, taking all facts and inferences in his favor, did not sit well with the union. According to Treuer's hired attorney, Gary Williams, in a discussion with union president Welch on October 9, 1996, Welch told Williams that there were "a lot of cooks in the kitchen," which Williams took to refer to his own involvement in the case. This comment and its

implication was echoed in an October 9, 1996, letter from Leifer to Treuer in which Leifer stated on behalf of the union that "this Local Union does not believe that you need an agent to represent you to your agent of your employer." The letter continued:

> Therefore, please give us clear direction as to who represents you. If it is the Local Union or if it is Attorney Williams. If you elect to have Attorney Williams represent you, then this Local Union is hereby requesting that you sign a release absolving the Local Union of representing you any further.

(Letter from Leifer to Treuer of 10/9/96.)

The Seventh Circuit has recognized that while unions do have the right to limit the role of outside attorneys in the grievance process itself, the employee nevertheless has an important right to seek the advice of an attorney:

> Employment disputes often involve complex issues of labor law, and it is understandable than an employee receiving union representation would also wish to speak to a private attorney about his case.... [U]nion attorneys not only represent individual employees, but the union as a whole. They are rightfully motivated by potentially conflicting concerns for the union and the collective bargaining process. Accordingly, union priorities may sometimes adversely affect the interests of the individual employee. Employees thus have an interest in retaining an attorney with no such conflict of interest to advise them of the process, their options and the merits of the case.

*Garcia*, 58 F.3d at 1179 (citing *Seymour v. Olin Corp.*, 666 F.2d 202, 208 (5th Cir.1982).) In *Seymour*, the union told the employee it would not pursue his grievance unless he fired his attorney. He refused to do so and the union refused to pursue his claim. The Fifth Circuit found that that union's refusal to process the grievance because Seymour had an attorney violated the union's duty of fair representation.[16]

---

**16.** The Fifth Circuit actually analyzed whether the union's action constituted arbitrary behavior rather than bad faith. In this case, however, the

right to seek counsel's advice falls under the bad faith prong, as it impacts whether the union felt animosity toward Treuer.

There is a difference between merely restricting an attorney's involvement in the actual grievance process and interfering with a union member's right to consult outside counsel. Leifer's letter can be interpreted either way. Taking everything in Treuer's favor, however, Treuer received a letter that can be read to request that he choose between consulting with his attorney and continuing forward with union representation before Shop–Rite. Welch's comment and Leifer's letter together could support a reasonable jury finding that Treuer's exercise of his right to seek the advice of counsel was a factor taken into consideration when the union addressed Treuer's grievance. Welch was the union president and an executive board member, providing the causal link to the board's actual decision. Treuer did not drop his attorney, and the union's executive board soon thereafter chose not to pursue arbitration; an unseemly connection can reasonably be inferred.

Moreover, taking the reaction to Treuer's hiring of an attorney by Welch as well as Leifer together with Leifer's hostility on September 30, 1996, Treuer has provided enough support for a jury to reasonably find that personal animosity against him was the basis for the decision not to arbitrate his grievance.

### C. The Employer's Breach of Contract

As stated above, I believe the union had a sure-fire winner against Shop–Rite. Neither the CBA nor the employee handbook nor past practice indicated that Treuer's actions constituted just cause for termination as opposed to a verbal warning or written reprimand. And at this time, Shop–Rite has not provided me with sufficient facts indicating that Treuer's failure to report or correct Quinlan's tare weight infraction was otherwise so serious and harmful to its business that it justified termination. Taking all facts and inferences in Treuer's favor, he did not play any part in committing the infraction or causing the WDATCP to fine Shop–Rite. A jury could reasonably find that Treuer was not terminated with just cause and therefore a breach of the CBA occurred.

## IV. CONCLUSION

**THEREFORE, IT IS ORDERED** that both the union's and Shop–Rite's motions for summary judgment are **DENIED.**